**RODGERS BROTHERS CUSTODIAL SERVICES, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

**No. 02–AA–951.**

District of Columbia Court of Appeals.

Argued March 11, 2004.

Decided April 8, 2004.

Philip R. Croessmann, with whom Paul Pascal [1] was on the brief, for petitioner.

Mary T. Connelly, Assistant Corporation Counsel, with whom Robert J. Spagnoletti, Corporation Counsel, and Edward E. Schwab, Acting Deputy Corporation Counsel at the time, were on the brief, for respondent.

Before SCHWELB, FARRELL and REID, Associate Judges.

REID, Associate Judge:

Petitioner Rodgers Brothers Custodial Services, Inc. ("Rodgers Brothers") challenges a decision of respondent District of Columbia Board of Zoning Adjustment ("the BZA") affirming a finding by an Administrative Law Judge that it was operating a business without a proper certificate of occupancy. We affirm the agency's decision since it is based on substantial evidence in the record as a whole, and its interpretation of its regulations is reasonable.

## FACTUAL SUMMARY

On February 25, 1991, Rodgers Brothers filed an application for a certificate of occupancy with respect to 10,000 square

---

1. Mr. Pascal filed a motion to withdraw from the case on March 4, 2004, due to a conflict of interest that developed. The motion was granted.

feet of premises located at 2225 Lawrence Avenue, N.E. in the District of Columbia. The application listed the purpose of the occupancy as "temporary storage of recyclable materials. All materials non-hazardous." Two separate places on the application form required a designation of "square feet occupied." In both places, Rodgers Brothers inserted, "10,000." On the same day, Georgetown Express, Inc. ("Georgetown Express") applied for a certificate of occupancy pertaining to "52,000 square feet" of the same Lawrence Avenue property, listing its purpose as "wholesale storage of paper products." A certificate of occupancy was issued to Rodgers Brothers on March 12, 1991, for lots 804 and 812 for "temporary storage: all materials are non-hazardous." Another certificate of occupancy was issued to Georgetown Express on March 30, 1991, for "wholesale storage[:] paper products."

As a result of complaints about operations conducted at the Lawrence Avenue property, the District lodged a complaint in the Superior Court of the District of Columbia seeking declaratory and injunctive relief against the Lawrence Avenue General Partnership, Georgetown Express and Rodgers Brothers on November 10, 1992. The complaint alleged that the Lawrence Avenue property contained excess trash and garbage and that an "open dump" was being operated at the site. The District and the three defendants agreed to the entry of a Consent Order in 1993, prohibiting an accumulation of "trash, garbage and hazardous waste materials" on the property, and requiring monthly reports to be filed by the three defendants. In addition, the consent order, signed by George Rodgers, Jr. and others, specified that (1) the monthly report should include "a description of matters found on [the] lot that go beyond the certificates of occupancy"; and (2) within three weeks after the issuance of the con-sent order, Rodgers Brothers and Georgetown Express were required to "erect and maintain a fence on the lot at 2225 Lawrence Avenue that separates the business operations of Georgetown Express and Rodgers Brothers[ ]."

On December 14, 1993, the District filed a motion in the Superior Court of the District to enforce the settlement agreement against Georgetown Express. Sometime between late 1993 and early 1994, Georgetown Express abandoned the site. Rodgers Brothers did not seek to amend its certificate of occupancy to cover its activities on Georgetown Express' 52,000 square feet of the Lawrence Avenue site.

Several years later, in October 1997, an investigator employed by the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), Shirley Washington, inspected the Lawrence Avenue property and found violations pertaining to the use of the site. On October 27, 1997, DCRA issued a notice of infraction against Rodgers Brothers. Under "nature of infraction" DCRA stated: "Use without certificate of occupancy."

In April 1998, a hearing took place regarding DCRA's notice of infraction. Prior to the opening statements, counsel for Rodgers Brothers challenged the nature of the infraction, arguing that there was no "use without a certificate of occupancy" since Rodgers Brothers had obtained a certificate. Counsel for the District reminded Rodgers Brothers' attorney that the District and Rodgers Brothers had been involved in a similar proceeding regarding another property and that Mr. Rodgers "is well aware on a personal basis that when the Government believes that you're "operating outside the scope of the [certificate of occupancy], that you get a No Certificate of Occupancy citation." The District's counsel also declared: "The

Government believes that the [c]ertificate of [o]ccupancy does not contemplate the operation of a solid waste facility on [the Lawrence Avenue] site; that what is going on at that site is the very minimum processing of materials, and that's distinct from the storage of materials ...." Government counsel indicated in his opening statement that the government would "show by a preponderance of the evidence that ... Rodgers Brothers engaged in ... a use of [the Lawrence Avenue] property for which there was no permit issued ...."

Ms. Washington testified at the April 1998 hearing on behalf of DCRA and Mr. George Rodgers, Jr. was the witness for Rodgers Brothers. Ms. Washington recounted the results of her inspection of the Rodgers Brothers' operations at the Lawrence Avenue site in October 1997, using photographs admitted into evidence showing all sorts of debris and solid waste on the site, including mounds of dirt, construction debris, tires, refrigerators, batteries, wires, metal pipes, a grinding machine used to grind solid waste with dirt, and tractors or front loaders to move material around the site or onto trucks. She mentioned that Rodgers Brothers had a "green machine ... that grinds the dirt and the solid waste together to make [a] mixture...." The batteries she saw on the ground were oozing "green liquid." Ms. Washington referenced Rodgers Brothers' application for a certificate of occupancy of the Lawrence Avenue property which Rodgers Brothers had submitted specifying "temporary storage of recyclable materials. All materials non-hazardous." Under the category "square feet occupied," Rodgers Brothers put, "10,000." She also identified and described Georgetown Express' application for a certificate of occupancy, as well as the certificates issued to both Rodgers Brothers and Georgetown Express. Furthermore, Ms. Washington discussed the external effects require-

ments for a nonconforming use, and asserted that she saw lots of dust emanating from the Lawrence Avenue site, and detected a noxious odor on the property during her inspection. On cross-examination, Ms. Washington was asked whether the green machine was "really grinding or ... sorting?" She replied:

I asked Mr. Rodgers what it was because I'd never seen anything like that. He said that it was a grinding machine, that ... he puts solid waste and dirt in there and it grinds it up into smaller particles, ... and that he takes it to, I think, a landfill or sell[s] it to a landfill.

Mr. Rodgers testified that he orally informed DCRA at the time his certificate of occupancy was issued that he intended to use the premises "to operate a construction and demolition debris business." Mr. Rodgers also asserted that he was not initially aware of Georgetown Express' certificate of occupancy for the Lawrence Avenue site. With respect to the green machine, he stated that material "was placed into the machine on a belt, which is made into a drum, a screen drum, where material is turned over until it tumbles out at the end of the drum." When initially asked, "do you take any of the material that you sort and make a product out of it," he replied, "Yes." When his counsel responded, "aren't you just sorting it," the District's counsel objected. Mr. Rodgers eventually agreed with his counsel that he was not "putting two things together to make a third thing." Mr. Rodgers also was asked where the tires on the property came from, and he responded: "Tires come up here from being in the roads. They are re-separated out, put together, and taken to a different [re]cycling facility." Furthermore, he conceded that Rodgers Brothers' work extended to the Georgetown Express part of the site.

On December 7, 1998, DCRA's Administrative Law Judge ("ALJ") issued a decision on Rodgers Brothers' challenge to DCRA's infraction action. It found Rodgers Brothers "fully liable" for the infraction and imposed a fine of $500.00 plus court costs in the amount of $40.00. The ALJ found, in part, that: (1) Investigator Washington ... visited the [Lawrence Avenue] site and observed construction and demolition debris being processed"; and that (2) "this processing included the sorting of various materials, including electrical wiring, various piles of old tires, ground up trash items mixed with dirt, batteries oozing a green liquid, refrigerators, bicycle parts, and a separation operation, all of which activities were being conducted in open air, in violation of the law ...." With respect to its conclusions of law, the ALJ, among other things, (1) emphasized the importance of information placed on the application for a certificate of occupancy, pointing out that applicants were required to provide "specific information about the proposed business/occupancy" and further were instructed to be "very detailed in the information provide[d]"; (2) Rodgers Brothers' "assertion is untenable that its [certificate of occupancy] for "storage" also authorized the use of the site for the processing of construction and demolition debris, and created a reasonable reliance on [its] part, given the substantial difference between merely storing materials and processing them"; (3) the DCRA met its burden of proof, and conclusively show[ed] through the sworn testimony of Investigator Washington, the photographs she took, and other documentary evidence, that [Rodgers Brothers] engaged in something other than storage on the site, i.e., the processing of construction

and demolition debris"; (4) Rodgers Brothers "was not credible" in denying knowledge, prior to the District's lawsuit against the Lawrence Avenue General Partnership, et al., of Georgetown Express' certificate of occupancy for part of the Lawrence Avenue site, and in insisting that Mr. Rodgers, Jr. "asked for and got permission to operate a construction and demolition debris operation from some unknown zoning official." Rodgers Brothers appealed the ALJ decision and order to the BZA.

In its notice of appeal, Rodgers Brothers gave as the basis for its appeal the following:

> [Rodgers Brothers] asserts that the ALJ erred in his Findings of Fact that Respondent was operating without a Certificate of Occupancy; erred in his reliance on facts not presented by either party and wholly outside the record; erred in finding that the Petitioner met its burden of proof; and erred in his interpretation and application of the law to the facts of this case.

The BZA issued a decision and order on May 14, 2002, generally affirming the ALJ's decision and order.[2] The BZA concluded that the ALJ's findings and conclusions were supported "by a preponderance of evidence in the record." The Board recognized that "sorting" was embraced under the concept of storage, but that "processing" was not:[3]

> While the sorting of construction and demolition debris would fall within the scope of the use authorized by the certificate of occupancy, the [BZA] concludes that the ALJ did not err in determining that Rodgers Brothers was operating

2. The BZA's decision and order became final on July 29, 2002.

3. The BZA undoubtedly sought to make clear that "sorting" did not constitute "processing" but properly fell under the activity of "storage."

without a certificate of occupancy in the processing of materials on the site, the handling of solid waste materials other than construction and demolition debris (including hazardous materials), the accumulation of solid waste and trash on the site, and in expanding its operations to the Georgetown Express portion of the site.

The Board declared that: "The permission to use the property for temporary storage and sorting, however, did not extend to processing." In that regard, the BZA asserted that at the time Rodgers Brothers applied for its certificate of occupancy, there were separate regulations governing storage "as a matter-of-right use in the C–M district, subject to the standards of external effects ..." (11 DCMR § 801.7(i)) and processing (11 DCMR § 801.7(j)). Not only did Rodgers Brothers fail to list "processing" on its application form, but "[t]he ALJ's finding that Rodgers Brothers was engaged in processing is supported by a preponderance of evidence in the record." Specifically, the BZA emphasized the "grinding machine" that Rodgers Brothers "operated ... on the premises that ground dirt and solid waste together to make a mixture of smaller particles." The BZA also determined that the ALJ's finding that Rodgers Brothers "handle[d] solid waste other than construction and demolition debris, ... including batteries oozing a green liquid," is "supported by a preponderance of evidence in the record." And, the BZA concluded there was record evidence that Rodgers Brothers' certificate of occupancy "was limited to the 10,000 square feet indicated in Rodgers Brothers application for the certificate, with the [lawsuit] Consent Order requiring that area to be separated from the Georgetown Express operations by a fence." Despite the limitation, the BZA pointed to testimony by Mr. Rodgers Jr. during which he "admitted that Rodgers Brothers had ex-panded its operations to the Georgetown Express portion of the site," and that he "guess[ed] [Rodgers Brothers'] operation entailed occupying the whole site." Rodgers Brothers petitioned this court for a review of the BZA's decision.

## ANALYSIS

■ Rodgers Brothers raises several challenges to the BZA's decision and order affirming the ALJ's decision and order in this case. Generally, this court sustains the BZA's findings "If they are 'supported by and in accordance with ... reliable, probative, and substantial evidence.'" *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment,* 816 A.2d 41, 45 (D.C.2003) (quoting D.C.Code § 1–1509(e) (1999) (footnote omitted)). We "'must uphold decisions made by the BZA if they rationally flow from findings of fact supported by substantial evidence in the record as a whole.'" *Watergate West, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 815 A.2d 762, 765 (D.C.2003) (quoting *Draude v. District of Columbia Bd. of Zoning Adjustment,* 582 A.2d 949, 953 (D.C.1990)). We "'may not substitute [our] own judgment [for that of the BZA] so long as there is a rational basis for the BZA's decision." *Id.* (quoting *Kenmore Joint Venture v. District of Columbia Bd. of Zoning Adjustment,* 391 A.2d 269, 276 (D.C.1978)). Furthermore, "we defer to the BZA's interpretation of the zoning regulations and must uphold that interpretation 'unless it is plainly erroneous or inconsistent with the regulations [and governing statute].'" *Georgetown Residents Alliance, supra,* 816 A.2d at 45 (quoting *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 30 (D.C.1992)).

■ Rodgers Brothers contends first that the ALJ and the BZA "erred by

failing to follow precedent, which establishes that [it] has a right to operate as a nonconforming use under its original [certificate] of [occupancy]."[4] They assert that our decision in *Perkins v. District of Columbia Bd. of Zoning Adjustment,* 813 A.2d 206 (D.C.2002), "reversed the BZA's ruling on the grounds that the decision was inconsistent with the BZA's prior interpretations of its regulations," and that in its case, the BZA should have followed its own decision in *Taylor v. Department of Consumer and Regulatory Affairs (DCRA),* BZA No. 94–0001 (BZA March 19, 1998). The District maintains that neither *Perkins* nor *Taylor* controls the outcome of this case because each of those decisions is distinguishable from the instant case.

*Perkins* was decided in December 2002, after the decisions were rendered by the ALJ and the BZA in this case. There a majority division of this court reversed the BZA's reversal of the ALJ's decision relating to Mr. Perkins' certificate of occupancy authorizing "Light Manufacturing, Processing, Fabricating & Warehousing Steel Products and Office and Retail Construction Industrial Supplies; All Material Non–Hazardous, Not sexually oriented." Mr. Perkins' business involved "compacting and deodorizing non-hazardous waste brought in by private contractors which was transferred to 18–wheel tractor trailers for transport to a landfill in Virginia

within 12 hours of arrival." *Perkins, supra,* 813 A.2d at 208. Perkins did not manufacture steel, but some steel products were in the waste. The central issue was whether or not Mr. Perkins' certificate of occupancy allowed him only to process steel products, not waste.

DCRA and the BZA concluded that because the term "processing" must be read to modify the term "steel," that Mr. Perkins could only process steel products, not waste. The ALJ invoked the Rule of the Last Antecedent—that " 'ordinarily, qualifying phrases are to be applied to the words of phrase immediately preceding them, and not to others more remote.' " (Citation omitted.) *Perkins, supra,* 813 A.2d at 209. The combination of the Rule of the Last Antecedent, and the " 'broad descriptions of activities permitted in C–M districts,' " *id.,* as well as the dictionary definition of "processing" prompted the ALJ to conclude that Mr. Perkins' business activities of compacting and deodorizing waste and transferring it to trucks and tractors for hauling to a landfill were permitted. On the other hand, the BZA concluded that Mr. Perkins could engage only in the manufacturing, processing, fabricating and warehousing of steel products, and the processing of waste was not permitted. In analyzing *Perkins,* a majority of a panel of this court determined that the ALJ also relied in part on prior precedent, *Concerned Citizens of Brentwood v. District of*

---

**4.** During oral argument, Rodgers Brothers maintained that it was not given proper notice that the issue was whether its certificate of occupancy permitted the handling or processing of waste. This specific argument was raised neither in Rodgers Brothers' appeal to the BZA, nor in its petition for review lodged in this court. Furthermore, Rodgers Brothers could not have been surprised that "processing" was an issue in this case even though the specific infraction charged "use without certificate of occupancy." Indeed, in another prior proceeding, Rodgers Brothers had been made aware of the District's practice to file an infraction notice of "no certificate of occupancy" when an individual or company was "operating outside the scope of the [certificate of occupancy]." Before any testimony was taken in this case, the District stated plainly: "The Government believes that the [c]ertificate of [o]ccupancy does not contemplate the operation of a solid waste facility on [the Lawrence Avenue] site; that what is going on at that site is the very minimum processing of materials, and that's distinct from the storage of materials . . . ."

*Columbia Bd. of Zoning Adjustment,* 634 A.2d 1234 (D.C.1993), in reaching its conclusion. Thus, in the absence of legislative history or intent, the *Perkins* majority declared that: "The Rule of Last Antecedent and the context and established application of the regulation support the interpretation that the processing use permitted by the certificate of occupancy is not limited to steel products." *Id.* at 214–15 (citation omitted).

Rodgers Brothers' case is different. The words of its certificate of occupancy are not complicated by several modifiers. The words state simply: "temporary storage: all materials are non-hazardous." The issue, then, was whether the words "temporary storage" included processing. The BZA's regulations, as interpreted both by the ALJ and the BZA provided a ready answer to that question. When Rodgers Brothers received its certificate of occupancy in March 1991, 11 DCMR § 801.7(i) authorized a "Wholesale or storage establishment, including open storage, except a junk yard." "Processing," which DCRA stated "signifie[d] a method of performing operations upon an item," *Perkins, supra,* 813 A.2d at 209 n. 6, was covered in a different regulation, 11 DCMR § 801.7(j), but Rodgers Brothers did not list "processing" in its application for a certificate of occupancy. Thus, *Perkins* is of no assistance to Rodgers Brothers.

Nor is *Taylor, supra,* of help to Rodgers Brothers. Based upon substantial record evidence, the BZA reversed the ALJ's decision because Mr. Taylor's business qualified as a nonconforming use and because Mr. Taylor "relied to his detriment on the government's promise to give him notice" of any rule changes. *Taylor, supra,* slip op. at 3–4. Here, the ALJ specifically discredited Mr. Rodgers, Jr.'s testimony concerning his verbal notice to DCRA of his plans "to operate a construction and demolition debris business," and there was substantial record evidence that Rodgers Brothers was not engaged in the mere temporary storage of non-hazardous waste material; rather it was also engaged in "processing," a method of performing operations on solid waste by placing it in a grinding machine. Hence, Rodgers Brothers case is not controlled by *Taylor.*

▮ Rodgers Brothers' second argument is unavailing—that the findings and conclusions of the ALJ and the BZA are not based on substantial evidence. To the contrary, the testimony of Ms. Washington regarding her site inspection and the accompanying photographs clearly show that Rodgers Brothers used a grinding machine to grind solid waste mixed with dirt. This constituted "processing," a non-permitted activity. The distinction between temporary storage and processing under the regulations is an important one. As the BZA points out in its brief: "While both temporary storage and processing are subject to the external effects standard and permitting requirements of 11 DCMR §§ 804 [Standards of External Effects (C–M) ] and 805 [External Effects Permit Applications (C–M) ], the external effects standard is plainly more difficult for a business 'processing' debris and solid waste than for a business that merely temporarily stores it." This is true because the standards relate to such phenomena as sound levels (§§ 804.2–804.4), the emission of smoke (§ 804.8), ground vibration (§ 804.13), the emission of odorous gases or other odorous matter (§ 804.9); and prohibit the escape or discharge of noxious, toxic or corrosive fumes or gases (§§ 804.9 and 804.10), as well as "objectionable amounts of cinders, dust, or fly-ash. (§ 804.11)." In addition, to ensure compliance with the external effects standard as set forth in § 804, applicants for a certificate of occupancy were required to submit:

(a) A site plan showing buildings and other structures, roadways, drainage and sanitary facilities, parking spaces, loading berths, landscaping and exterior lighting, and back-up generators or power supplies (if any); and

(b) A description of any operations that would be subject to the standards of external effects in § 804.

11 DCMR § 805.1(a) and (b). Given the regulatory requirements of §§ 804 and 805, we are satisfied that Rodgers Brothers could not demonstrate compliance on the record before us even assuming that sorting does not constitute "processing," and therefore, we see no need to return this matter to the BZA for remand to the ALJ to clarify his conclusions regarding "processing." A site plan showing the actual state of the Rodgers Brothers site, and a description of the operations of the green grinding machine undoubtedly would show non-compliance with the external effects standard. Moreover, the testimony of Ms. Washington that she saw lots of dust coming from the Rodgers Brothers' site, smelled a noxious odor on the property, noticed materials on the site which could not be described as construction and demolition debris, including "batteries oozing a green liquid" and "large piles of scrap tires," and observed the green grinding machine, confirms that Rodgers Brothers' activity on the site was not limited to "temporary storage." Rather, Rodgers Brothers was engaged in processing ("a method of performing operations upon an item)," *Perkins, supra,* 813 A.2d at 209 n. 6, which precluded its compliance with the external effects standard, as well as with the terms of its certificate of occupancy.

The third argument raised by Rodgers Brothers is unpersuasive—that the BZA based its decision on "evidence of safety and health related issues, hazardous materials questions and 10,000 square foot limi- tations rather than ... relevant, substantial evidence of the violation cited." The company argues that it never was cited with health or public safety or hazardous waste violations or expanding its operations to the Georgetown Express part of the site. The fact that Rodgers Brothers may not have been cited for these specific violations, separate and apart from the infraction related to violation of the certificate of occupancy does not negate the substantial record evidence, credited by the ALJ and presented through the testimony of Ms. Washington. During her site inspection, Ms. Washington saw "electrical wiring, various piles of old tires, ground up trash items mixed with dirt, batteries oozing a green liquid, refrigerators, [and] bicycle parts." As the BZA noted, " 'hazardous materials' would include leaking batteries."

Moreover, on its application for a certificate of occupancy, Rodgers Brothers clearly identified its activity as "temporary storage [of] non-hazardous materials" confined to 10,000 square feet of the Lawrence Avenue property. The BZA stressed the importance of its application rule, as set forth in the zoning regulations, at 11 DCMR § 3203.9. That rule, as interpreted by the BZA, requires "specific information about the proposed business/occupancy" as well as "very detailed ... information." In drawing its conclusion that Rodgers Brothers' occupancy of the Lawrence Avenue property was limited to 10,000 square feet, the BZA relied on the application form as a way of enforcing effectively its zoning regulations. Ordinarily municipalities look to a building permit accompanied by an application and building plans to ensure consistency with zoning regulations. *See* ANDERSON'S LAW OF ZONING (4th ed.1996, at 362). However, since "uses may be commenced or changed without construction or altera-

tion which requires a building permit, and such uses or changes may be in violation of the zoning regulations, [m]ost municipalities undertake to plug this gap through the use of occupancy permits." *Id.*

Just as DCRA could look to building plans and a building permit application form filed to obtain a building permit to determine the nature of the structure contemplated when the building permit was issued, it could reasonably examine an application form for an occupancy permit to ascertain the square footage and the activity covered by a certificate of occupancy. "[W]e defer to the BZA's interpretation of the zoning regulations and must uphold that interpretation 'unless it is plainly erroneous or inconsistent with the regulations [and governing statute].'" *Georgetown Residents Alliance, supra,* 816 A.2d at 45. In light of the application rule set forth in the zoning regulations, it was not unreasonable for the DCRA and the BZA to interpret Rodgers Brothers' certificate of occupancy as limited to 10,000 square feet of the Lawrence Avenue property, and to the activity of "temporary storage." *Cf. Rowatti v. Gonchar,* 101 N.J. 46, 500 A.2d 381 (1985) (where application form for a building permit described the proposed addition as a "mother-daughter" or one-family addition but a multi-family addition was erected, the Supreme Court of New Jersey properly gave deference to a decision of the local Board of Adjustment concluding that a section of the municipal code was violated); *accord In re Schultz Mgmt.,* 64 N.Y.2d 1057, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985) (where certificate of occupancy was issued based on misrepresentations made in a related application for an alteration permit, the certificate was properly revoked). Indeed the BZA's interpretation of Rodgers Brothers' certificate of occupancy is supported by Mr. Rodgers, Jr.'s signature on the Consent Order which resolved the District's 1992 lawsuit against Rodgers Brothers and others. The consent order not only prohibited the accumulation of "trash, garbage and hazardous waste materials" on the Lawrence Avenue site, but also required Rodgers Brothers to file a monthly report describing "matters found on [the] lot that go beyond the certificate[ ] of occupancy," and further, obligated Rodgers Brothers to "erect and maintain a fence on the lot at 2225 Lawrence Avenue that separates the business operations of Georgetown Express and Rodgers Brothers[ ]." Yet, Mr. Rogers, Jr. readily testified that Rodgers Brothers did work on the Georgetown Express part of the site, and he "guess[ed] [Rogers Brothers'] operation entailed occupying the entire site."

In summary, based upon our review, we are satisfied that the BZA's decision "rationally flow[s] from findings of fact supported by substantial evidence in the record as a whole." *Watergate West, Inc., supra,* 815 A.2d at 765. In addition, the Board's interpretation of its zoning regulations and the importance of the certificate of occupancy application form is reasonable and not inconsistent with its governing statute. We owe deference to that interpretation, and "may not substitute [our] own judgment [for that of the BZA] so long as there is a rational basis for the BZA's decision." *Id.*

Accordingly, for the foregoing reasons, we affirm the agency's decision.

*So ordered.*