The OAKLAND CONDOMINIUM,
Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

Advisory Neighborhood Commission
1C, Intervenor.

No. 10–AA–536.

District of Columbia Court of Appeals.

Argued May 10, 2011.

Decided June 2, 2011.

John Lawrence Hargrove, for petitioner.

Holly M. Johnson, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Stacey Moye, for intervenor.

Before FISHER, Associate Judge, REID,* Associate Judge, Retired, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

Petitioner, The Oakland Condominium, challenges the determination of the District of Columbia Board of Zoning Adjustment (hereafter "BZA" or "The Board") granting the use variance application of property owners of a rooming house located in petitioner's neighborhood to use additional rooms on that property for transient occupancy. Petitioner argues that the BZA, acting pursuant to 11 DCMR § 3103.2, erred in determining that the property owners were entitled to the variance relief requested. We affirm the BZA's order, recognizing that the relief requested was minor relative to the vibrant and active community in which the property is situated.

## I.

In March 2003, Lucia and Claudio Rosan purchased the subject property (hereafter "the property"), located at 2005 Columbia Road, N.W., in the Kalorama Triangle area of the Adams Morgan neighborhood of the District of Columbia. The property is a four-story plus basement row house located in the R–5–D Zone District. The previous owner, Richard Bird, had operated a fifteen-unit rooming house in the property since 1969, which was permitted by the zoning regulations as a matter-of-right without restriction as to the length of patron occupancy. However, on November 3, 1989, the Zoning Commission amended the regulations on rooming houses to require, among other things, a minimum length of occupancy of 90 days. *See* 11 DCMR § 330.6.

Prior to the purchase of the property from Mr. Bird's estate, the Rosans saw Mr. Bird's Certificate of Occupancy hanging on the wall inside the property and it contained no limit on the number of units. All fifteen units in the home were furnished as individual rooming units. Mrs. Rosan testified that, following the purchase of the property, she and her husband spoke to city government officials in order to find out what they needed to do in order to continue Mr. Bird's rooming house business on the property. According to Mrs. Rosan, she and her husband were told that they had to apply for a "change of ownership" Certificate of Occupancy, which was nothing more than a "name change" on Mr. Bird's existing certificate. However, when they tried to do so, city officials then told them that a Certificate of Occupancy for this property would be limited to eight rooms only.

Acting on the advice of a Zoning Reviewer, the Rosans also applied for a Certificate of Occupancy to use the premises as an "inn/tourist house" consisting of fifteen rooms. Their application was denied on the basis that the use applied for was not a matter-of-right use in the R–5–D District. A letter from the Zoning Administrator on April 7, 2003, informed the Rosans that they would require a use variance to pursue their intended plan for the property. However, a subsequent applica-

* Judge Reid's status changed to Associate Judge, Retired, on April 7, 2011.

tion for a Certificate of Occupancy for an eight-room boarding house was granted on March 20, 2003. Meanwhile, and significantly, the Rosans were able to secure building permits from the Department of Consumer and Regulatory Affairs ("DCRA") for demolition, plumbing, heating, and renovation of the property on the basis of a twelve-room housing operation. On May 20, 2003, the Rosans applied to the BZA for a variance to allow a fifteen-room operation, but the BZA denied the variance application on September 14, 2003.[1]

The Rosans continued with their renovation project, at a cost of approximately $300,000, on the basis of their approved plan involving twelve rooms. They again applied for a Certificate of Occupancy for a twelve-room boarding house on August 11, 2003, but it was denied. On August 27, 2003, the DCRA requested that the Rosans come in to change their permits to reflect only an eight room operation. The Rosans did not comply with that request, and proceeded to operate the property as a twelve-room bed and breakfast for the next five years; no enforcement action was taken against them during that time.

In a letter dated October 15, 2008, the Zoning Administrator gave notice of intent to revoke the Rosans' Certificate of Occupancy. On February 27, 2009, the Zoning Administrator then switched course and advised the Rosans that they may continue to operate a rooming house at the property but that it must be limited to eight rooms. He further advised the Rosans to seek a use variance to expand the occupancy be-

yond eight rooms. The Rosans then filed another use variance application on April 14, 2009. Following public hearings on September 15, 2009, October 27, 2009, and November 19, 2009, the BZA granted the Rosans' use variance application. The Oakland Condominium, joined by intervenor Advisory Neighborhood Commission (ANC) 1C, timely filed a petition of review of the BZA's Order granting the variance.[2]

## II.

■ "In reviewing a BZA decision, we must determine (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings. Generalized, conclusory or *incomplete findings* are insufficient; subsidiary findings of basic fact on all material issues must support the end result in a discernible manner." *Mendelson v. District of Columbia Bd. of Zoning Adjustment*, 645 A.2d 1090, 1094 (D.C. 1994) (emphasis in original) (citations omitted).

■ "We will not reverse [the BZA's decision] unless its findings and conclusions are '[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' in excess of its jurisdiction or authority; or '[u]nsupported by substantial evidence in the record of the proceedings before the Court.'" *Economides v. District of Columbia Bd. of Zoning Adjustment*, 954 A.2d 427, 433 (D.C.2008) (quoting *Mendelson, supra*, 645 A.2d at

---

1. The BZA held a hearing on this variance application in July 2003, at which the Rosans appeared unprepared and without counsel. The Rosans admitted in later testimony that they did not understand what was expected of them at that hearing and that the BZA was not receptive of their contention that they

were "grandfathered" into Bird's use of the property.

2. Petitioner and Intervenor ANC–1C filed joint briefs in this matter, and all arguments attributed to petitioner herein are therefore shared by ANC–1C.

1094, and D.C.Code § 2–510(a)(3) (2001)). "An agency's interpretation of the regulations that govern it must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations. At the same time, where the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference." *Id.* (internal quotation marks and citations omitted).

In accordance with this standard, we proceed to review whether the BZA acted within its authority in granting the Rosans' use variance request.

### III.

■ D.C.Code § 6–641.07(g)(3) provides that BZA may grant a variance

[w]here, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this subchapter would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map. . . .

*See also* 11 DCMR § 3103.2. This court has distilled a three-part test that "[i]n

order to obtain variance relief, an applicant must show that (1) there is an extraordinary or exceptional condition affecting the property; (2) practical difficulties will occur if the zoning regulations are strictly enforced; and (3) the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan. . . ." *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 1000 (D.C.2005).

Petitioner contests the BZA's determination with respect to each prong of this three-part test.

#### A. Exceptional Condition

■ First, petitioner argues that the BZA erred in determining that there was an "exceptional situation" that warranted the Rosans' requested use variance. Relying on our decision in *Monaco v. District of Columbia Bd. of Zoning Adjustment*, 407 A.2d 1091 (D.C.1979), the BZA reasoned that "a zoning history which implicitly approved a use and thereby gave rise to good-faith, detrimental reliance by the property owner help[s] to establish the necessary exceptional situation." Here, according to the BZA, the Rosans purchased a house which had been "openly and continuously used as a 15–unit rooming house for over 30 years," and its Certificate of Occupancy "set forth no limitations on the number of rooms or square footage, and had no expiration date." The BZA continued to explain that the Rosans "had no immediate reason to question the use of 15 units in the rooming house," and, in fact, when they applied for a Certificate of Occupancy in 2003, they "may well have been entitled to [one] for a rooming house with no restriction on the number of rooms."[3] Therefore, the BZA concluded,

---

3. The Rosans presented the expert testimony of Toye Bello, who explained that "[i]f the

"[t]his unfortunate and unusual chain of events presents an exceptional situation unique to this property."

In *Monaco,* we affirmed the BZA's granting of a variance to the Republican National Committee ("RNC") and an intervenor, who were seeking to expand the RNC's offices located in an R–4 district bordering the Capitol Grounds. *Id.* at 1095. The United States government had previously condemned the RNC's existing property in order to construct the Madison Library. *Id.* Because of the intervenor's "close relationship with Congress," it was able to find and acquire another suitable property for the RNC offices, and received the assurances of the Zoning Commission that the project could "proceed by means of a series of area variances." *Id.* We agreed with the BZA that the expansion project warranted the requested area variance relief because of these unique historical circumstances, especially because of the parties' "good faith, detrimental reliance on the zoning authorities' informal assurances," and therefore, it constituted an "extraordinary situation." *Id.* at 1101.

According to petitioner, this case is unlike *Monaco* because there the RNC and intervenor were diligent and were repeatedly assured by zoning authorities that their project would be able to proceed. However, petitioner claims that in contrast to the parties in *Monaco,* the Rosans had both actual and constructive notice that regulations limited their intended use of the property to eight rooms, starting when their Certificate of Occupancy was explicitly limited to eight rooms and their first variance application was

application of the Rosans had been handled appropriately the first time, they should have been able to walk into DCRA and obtain a certificate of occupancy for change of use and retain the rooming house certificate of occupancy without limitation on the number of rooms." He further testified that there was

denied in 2003. Moreover, citing *Rafferty v. District of Columbia Zoning Comm'n,* petitioner continues, the Rosans' reliance on a building permit cannot be invoked to avoid restrictions on the project where they clearly had knowledge of the restrictions before pursuing the renovations. 662 A.2d 191, 193 (D.C.1995) (holding that petitioners had constructive notice of zoning regulations and could not justifiably rely on issuance of building permits).

The Board urges us to affirm its determination that there existed an "exceptional condition," in accordance with *Monaco* as well as *De Azcarate v. District of Columbia Bd. of Zoning Adjustment,* 388 A.2d 1233, 1237 (D.C.1978) ("the extraordinary or exceptional condition which is the basis for a use variance need not be inherent in the land"). According to the Board, it had substantial evidence to conclude that the Rosans had relied in good faith on the actions of city officials, including when they purchased the property and invested in its renovation. First, the Rosans reasonably relied on the issuance of the building permits by DCRA in believing that they were acting in accordance with the zoning regulations. *See, e.g., Basken v. District of Columbia Bd. of Zoning Adjustment,* 946 A.2d 356, 364 (D.C.2008) ("[T]he building permit is the document that reflects a zoning decision about whether a proposed structure, and its intended use as described in the permit application, conform to the zoning regulations."); *Rodgers Bros. Custodial Servs. v. District of Columbia Bd. of Zoning Adjustment,* 846 A.2d 308 (D.C.2004).

nothing wrong, illegal, or dishonest in the filing of the building permit application and that it was "reasonable for [the Rosans] to rely upon the issuance of a building permit to proceed with all the renovation of the building."

Second, and relatedly, the Rosans had no reason to understand that the building permits did not represent the zoning determination that they were seeking. It was only in 2008, according to the Board, that the reason for the limitation was explained to them.

Upon review of the record and the BZA's findings of fact, we conclude that the BZA's finding that the Rosans demonstrated a good faith and detrimental reliance constituting an exceptional situation is supported by substantial evidence. As the BZA noted, the property "had been openly and continuously used as a 15–unit rooming house for over 30 years, the [Certificate of Housing] for which was publicly visible hanging on the wall." The combined effect of "the issuance of the unrestricted 1969 C of O, the issuance of the license to Mr. Bird for 15 units, and the issuance to the Applicants themselves, of two building permits, and all necessary final inspections, on a 12–unit building" as well as the fact that DCRA took no enforcement action against them, "gave rise to the Applicants' good faith, detrimental reliance, leading them to believe they were entitled to operate a 12–unit rooming house." We also defer to the BZA's determination that "Ms. Rosan testified convincingly . . . that she and her husband did not understand why" their 2003 Certificate of Occupancy was limited to eight units and that "they could not get a satisfactory answer from DCRA personnel."

## B.  Undue Hardship

■ The BZA concluded that the Rosans were presented with an "undue hardship," meaning that their "property cannot be put to any zoning-compliant use for which it can be reasonably adapted," citing, inter alia, Palmer v. District of Columbia Bd. of Zoning Adjustment, 287 A.2d 535, 542 (D.C.1972) ("A use variance cannot be granted unless a situation arises where reasonable use cannot be made of the property in a manner consistent with the Zoning Regulations"). The BZA reasoned that the four "extra" units in the property could not be "reasonably" adapted to comply with the zoning regulations because the Rosans had shown at the hearing that any effort to adapt those four rooms to other permitted uses would create a financial hardship. The BZA found support for this conclusion in Gilmartin v. District of Columbia Bd. of Zoning Adjustment, 579 A.2d 1164, 1171 (D.C.1990), where we held that "at some point economic harm becomes sufficient, at least when coupled with a significant limitation on the utility of the structure." The BZA noted that it explained at the hearing that the question of adapting the entire building to a use permitted in the zone, such as a one-family dwelling, was not before it and that the sole issue was "the possibility of adapting the four 'extra' rooms to a permissible use because the other eight rooms were already permitted."

Petitioner is unsatisfied with the BZA's finding of undue hardship and offers several arguments against it. Petitioner emphasizes foremost that this case concerns a use variance, rather than an area variance as in Gilmartin, supra, and therefore, there is a more stringent test for determining whether the applicants are entitled to relief. Petitioner sets forth the undue hardship test for a use variance, as articulated in Palmer, supra, 287 A.2d at 541:

> [A] more stringent showing is warranted with respect to the more drastic relief inherent in a use variance. Viewing the difference between 'practical difficulties' and 'undue hardship' as a matter of degree, we follow those decisions which construe the statute in the disjunctive, applying the former criterion to area variances and the latter to use variances. [Footnote omitted.]

The BZA's application of *Gilmartin*, according to petitioner, was therefore inappropriate.

We disagree with petitioner's assessment. The BZA's order, while citing to *Gilmartin*, reflects that it applied the appropriate test to establish undue hardship in the context of a use variance application, citing *Palmer, supra*, 287 A.2d at 542, and *Bernstein v. District of Columbia Bd. of Zoning Adjustment*, 376 A.2d 816, 819 (D.C.1977) ("[I]t must be shown that strict application of the Zoning Regulations would preclude the use of the property for any purpose to which it may reasonably be adapted.").

Petitioner also challenges the BZA's determination of undue hardship on the basis that "the self-created hardship" rule precludes the Rosans from their requested relief.[4] In so asserting, petitioner relies on several cases where a property owner's own affirmative acts precluded a basis for granting the use variance relief sought. In particular, petitioner notes that in *Clouser v. David*, 114 U.S.App.D.C. 12, 13, 309 F.2d 233, 234 (1962), the court affirmed the BZA's denial of a use variance application where the BZA had determined that the "[h]ardship, if any, has not resulted from the location, situation, or condition of the property, but solely from appellee's appropriation of it for commercial purposes without first having obtained the necessary change in zoning." *See also Silverstone v. District of Columbia Bd. of Zoning Adjustment*, 372 A.2d 1286, 1291 (D.C.1977) *opinion vacated in part on reconsideration*, 396 A.2d 992 (D.C.1979) ("[P]etitioners stated that they were aware

of the litigation pending before this court involving the proper use of their newly acquired premises. Accordingly, they assumed the risk that the property they purchased might be limited as to how it may be used."); *Salsbery v. District of Columbia Bd. of Zoning Adjustment*, 357 A.2d 402, 404 (D.C.1976) ("A self-inflicted hardship, such as this, will not support the grant of a use variance."). Likewise, petitioner asserts that the record supports its conclusion that the Rosans had actual knowledge that they had no zoning authority to operate a twelve-room facility. In their view, the strongest evidence of their knowledge is the 2003 Certificate of Occupancy which provided for eight rooms only. Further, petitioner notes that BZA's order omits findings that the Rosans did not know that their project lacked zoning authorization.

We are persuaded by the BZA's treatment of the "self-created hardship" rule. The BZA explained in its Order that, "[i]n the realm of use variances, the threshold is lower [than in the context of an area variance], and knowledge that a particular use would violate the Zoning Regulations is enough to raise the specter of a finding of self-imposed hardship, which would defeat a use variance request." The BZA continued, "[t]he Applicants here are requesting a use variance, but the Board does not find that they had the requisite knowledge that the use of the subject property for a 12–unit rooming house would violate the Zoning Regulations." Even though the Rosans proceeded with their renovation for twelve units after receiving a Certificate of Occupancy for only eight, the BZA "de-

---

4. "[S]ome jurisdictions prohibit the grant of a variance to relieve a hardship that was created by the applicant.... Many jurisdictions find that persons who acquired land for a purpose outlawed by the existing zoning regulations have created the hardship that necessitates the variance. There is a presumption

that self-created hardship exists where the property owner had actual or constructive knowledge of the limitations on the use of the property under the zoning ordinances in effect prior to or at the time of purchase." PATRICIA E. SALKIN, AMERICAN LAW OF ZONING § 13:18, at 13–57–59 (5th ed. 2010).

cline[d] to find this created a self-imposed hardship," because the Rosans "could not have renovated the building for 12 units without the implicit agreement and permission of the District government in issuing the building permits and building inspection approvals." The BZA emphasizes that the city took no enforcement action against the Rosans until the Zoning Administrator's October 15, 2008 letter.

Petitioner also challenges the BZA's findings that there are no lawful conforming uses to which the property can be put at a reasonable return. In petitioner's view, the BZA made bare findings without evidence in the record to support that conclusion including, for example, that converting the four rooms for longer-term rental use would be "unreasonable," considering that the longer-term rental rooms would be subject to additional restrictions such as no central dining area for guests. According to petitioner, there was no evidence in the record that such a conversion would in fact be unreasonable or unworkable. The only evidence in the record of a deleterious effect of using the four rooms for extended stay occupancy is that they would produce less revenue. However, petitioner asserts, that fact alone is insufficient to establish undue hardship.[5]

Again, "we are satisfied that the BZA's decision 'rationally flow[s] from findings of fact supported by substantial evidence in the record as a whole.'" *Rodgers Bros. Custodial Servs., supra,* 846 A.2d at 317. The BZA's Order and the record contain testimony by Mrs. Rosan concerning the financial hardship that she and her husband were facing. The record also reflects that the Rosans had invested approximately $1.1 million in the property.[6] The BZA reasonably concluded that "[c]onverting four rooms to be used for a more–than–90–day stay is not only expensive, but these rooms would also be subject to the other restrictions" discussed *infra,* and that "[t]he economic harm to Applicants, coupled with the significant limitations on the utility of the building which could arise with the use of only eight units, or with the use of the 'extra' four units in a differing manner, constitutes the undue hardship necessary to satisfy the second prong of the use variance test." Our case law squarely establishes that the BZA may consider "[e]conomic use of property . . . as a factor in deciding the question of what constitutes an unnecessary burden" *Gilmartin, supra,* 579 A.2d at 1170, and we will not reverse its determination, supported by the record, "preserving the Rosans' right to continue a nonconforming use while protecting their right to achieve a reasonable rate of return on their property."

5. Relatedly, petitioner also contests the BZA's focus on the four rooms alone rather than considering the use of the entire property as a single family or single-family-with-basement-unit residence. Petitioner "submit[s] that the [BZA's] exclusion of this alternative from consideration was arbitrary and inconsistent with the terms of 11 DCMR § 3103.2, which provides for the granting of variances where an owner can show that there are certain exceptional circumstances 'of a *specific piece of property.*'" In petitioner's view, the "four extra rooms have no existence as a specific piece of property either legally or in fact."

We agree with the Board that it permissibly focused its discussion to those four rooms only during its analysis of the "undue hardship" element, whose focus is on the hardship to the owner and is not limited to the property as a whole. *See* D.C.Code § 6–641.07(g)(3) ("the strict application of any regulation adopted under this subchapter would result in . . . exceptional and undue hardship *upon the owner* of such property") (emphasis added); 11 DCMR § 3103.2.

6. Mrs. Rosan testified that converting the four rooms would result in at least a one-third drop in income and would "impose a tremendous financial burden" on them.

## C. Impairment of Zoning Plan

■ Lastly, with respect to the third and last prong of the three-part variance analysis, petitioner avers that the grant of the use variance impairs the integrity of the zone plan. Petitioner emphasizes that the Office of Planning (OP) recommended denial of the variance, "in part on the ground that it would be inconsistent with the intent of Order 614."[7] In petitioner's view, the BZA took a far too narrow construction of the zoning plan in concluding that Order 614 and its corresponding regulations were intended to prevent only new transient uses. When properly understood, petitioner asserts, "it becomes apparent that a dominant theme of the zone plan for residential neighborhoods such as that of which 2005 Columbia Road is a part is, quite specifically, protection from intrusion or expansion of hotels and other commercial facilities for transient guests." At the same time, according to petitioner, the BZA's assessment of the variance's harm to the public good is understated: approval of the variance permits the expansion of a transient facility in the neighborhood by 50% and therefore introduces even more "fleeting commercial customers of a hotel-like business enterprise in the midst ... of a residential neighborhood."

We are mindful that "we defer to the BZA's interpretation of the zoning regulations and must uphold that interpretation 'unless it is plainly erroneous or inconsistent with the regulations.'" *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment,* 816 A.2d 41, 45 (D.C.2003). The BZA concluded that the "intent of Z.C. Order No. 614, and now, § 330.6, was/is to control the proliferation of *new* daily-occupancy rooming houses in the City. The non-proliferation intent of Z.C. Order 614 is not undermined by the continued use of this rooming house because it is not a new use, but pre-dates Z.C. Order No. 614, and is entitled to operate as a nonconforming use with or without the variance for the four 'extra' rooms." "We owe deference to that interpretation, and 'may not substitute [our] own judgment [for that of the BZA] so long as there is a rational basis for the BZA's decision.'" *Rodgers Bros. Custodial Servs., supra,* 846 A.2d at 317. Moreover, the BZA reasonably and convincingly found—based on witnesses' testimony—that "there will be little difference between the external traffic" and noise "produced by 12 rooms and those produced by eight."[8] We are equally satisfied with the BZA's careful and detailed treatment of the objections raised by the OP and ANC, at pp. 17–20 of its order.

## IV.

Finally, petitioner asserts that the BZA erred when it considered the February 27, 2009, letter by the Zoning Administrator to the Rosans, in which the Zoning Admin-

---

**7.** Order 614 and 11 DCMR § 330.6 prohibit transient rooming houses in residential districts. 11 DCMR § 330.6 provides that:

A rooming or boarding house shall be permitted as a matter of right in an R–4 District; provided:

(a) Accommodations are not provided to transient guests who stay ninety (90) days or less at the premises;

(b) No sign is displayed on the premises;

(c) No advertisement is displayed or published on or off the premises holding out the establishment to be a hotel, motel, inn, hostel, bed and breakfast, private club, tourist home, guest house, or other transient accommodation;

(d) Cooking facilities are not provided in any individual unit; and

(e) In a rooming house, no central dining or food preparation area is provided for guests.

**8.** We also understand petitioner and ANC–1C to have conceded this issue at oral argument.

istrator determined that the Rosans were grandfathered for a transient rooming house facility, but that they were limited to eight rooms. According to petitioner, the Rosans failed to directly appeal this letter to the BZA, and therefore, the issues presented in the letter were beyond the scope of the BZA proceedings. Yet, petitioner complains, the BZA proceeded to adjudicate precisely the question of whether the Rosans were limited to eight rooms, acting "without observance of procedure required by law" within the meaning of D.C.Code § 2–510(a)(3)(D).

We do not find this complaint of a procedural nature to be persuasive. As the Board effectively argued before us, there is nothing inconsistent about the BZA granting this variance while at the same time letting the Zoning Administrator's order stand. The issues underlying that order and the issues underlying the Rosans' variance application were necessarily related and relevant to the underlying BZA proceedings: namely, the basis of the Rosans' belief that they would be able to continue Mr. Bird's use of the property, and whether that belief was reasonable and in good faith. Therefore, the facts relevant to that question were a proper subject matter for the BZA's consideration.

We have in this case an exemplary BZA decision which reflects a balancing of the strictures of cold zoning regulations with the vicissitudes of human nature and condition. Accordingly, and for the foregoing reasons, we affirm the agency's decision.

*So ordered.*