Paul A. BASKEN, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

and

1636 Irving Street, LLC and The Madera Condominium Association, Inc., Intervenors.

No. 06–AA–379.

District of Columbia Court of Appeals.

Argued Oct. 17, 2007.

Decided April 18, 2008.

Andrea C. Ferster, Washington, DC, for petitioners.

Donna M. Murasky, Senior Assistant Attorney General, with whom Linda Singer, then Acting Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Edward E. Schwab, then Deputy Solicitor General, filed a statement in lieu of brief, for respondent.

Paul J. Kiernan, with whom Christopher H. Collins, Washington, DC, was on the brief, for intervenors.

Before FARRELL, FISHER, and THOMPSON, Associate Judges. .

THOMPSON, Associate Judge:

Petitioners Paul A. Basken and Joshua S. Meyer filed an appeal with the District of Columbia Board of Zoning Adjustment (the "BZA" or the "Board") challenging decisions of the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") that allowed intervenors [1] to enlarge an apartment building located at 1636 Irving Street, N.W. ("the Irving Street building"), and to convert it to a seven-unit building.[2] The BZA dismissed the appeal as untimely. We affirm.

## I. Background

The Irving Street building is located in an R–4 residential district.[3] On September 9, 2004, DCRA issued Building Permit No. B465646 ("the first building permit") with respect to the property, allowing intervenors to erect a three-story addition onto the rear of the building and to increase the number of apartment units in the building from three to four. The pertinent language of the first building permit reads "THREE STORY REAR ADDITION INTERIOR REMODEL" and "To be occupied as 4–UNITS APTS."

On December 17, 2004, DCRA issued an amended building permit for the Irving

---

1. Intervenors are 1636 Irving Street, LLC and The Madera Condominium Association, Inc.

2. Petitioner Basken resides next door to the Irving Street building at 1638 Irving Street, N.W. Petitioner Meyer resides at 1640 Irving Street, N.W. Historic Mount Pleasant, Inc. is also listed on the notice of appeal as a petitioner in this matter. In light of our disposition of the case, we do not reach intervenors'

argument that Historic Mount Pleasant lacks standing to appeal.

3. District zoning regulations provide that an R–4 district "shall not be an apartment house district" and that "the conversion of existing structures shall be controlled by a minimum lot area per family requirement." 11 DCMR § 330.3.

Street building, designated as Building Permit No. B468513 ("the revised building permit"). The revised building permit reads in pertinent part: "REVISION TO # 465646—ADDITION OF ONE KITCHEN ON FIRST, SECOND & THIRD FLOORS. CONVERTING 3 UNITS APT. INTO 7 UNITS. REVISION OF INTERIOR FOR PREVIOUSLY APPROVED ADDITION. SUBJECT TO ZONING APPROVAL OF NUMBER OF UNITS IN ZONE."

By the time the revised building permit was issued, construction of the three-story rear addition was nearly complete, and by January 15, 2005, the new construction was under roof.[4] While work on the project was underway, however, petitioners complained to DCRA, to their Ward 1 Council Member (Mr. Graham), and to their Advisory Neighborhood Commission 1–D ("ANC 1–D") representatives, asserting that the construction would result in a number of units in excess of the number allowed under applicable zoning regulations. Petitioners also complained that intervenors were being permitted to expand the Irving Street building to a size that was too large for its lot (*i.e.*, that exceeded the maximum lot occupancy) and without the required setbacks from property lines.[5]

At a public meeting on May 23, 2005, ANC 1–D passed a resolution that advised DCRA "to review the [Irving Street] property immediately for possible violations of R–4 zoning regulations" and to "refrain from issuing any certificate of occupancy for the residences at 1636 Irving Street Northwest, as currently configured, pending approval from the District Office of Zoning." ANC 1–D identified as its "issues and concerns" that the Irving Street building "has been developed into seven dwelling units on a lot of 2997 square feet," whereas "an 'apartment house' in an R–4 district must have 900 square feet of lot per dwelling unit, implying no more than three dwelling units on this lot."[6] On May 26, 2005, DCRA Director Patrick Canavan wrote to the Chair of ANC 1–D and acknowledged what he called "errors in the review and issuance of the building permits." He stated, however, that "[t]he Zoning Administrator will not deny the property owners a Certificate of Occupancy for the property on the basis of the zoning review error." Director Canavan's letter also stated that the ANC "has the right to appeal this decision to the [BZA]."

The record shows that on May 27, 2005, petitioner Basken emailed a copy of Director Canavan's May 26, 2005 letter to petitioner Meyer, ANC representatives, and others. Basken noted in his transmittal email that Director Canavan's letter "explicitly invites an appeal to the BZA for a decision on how to resolve the matter," and asked whether the ANC and the Mount Pleasant Historical Society were willing to file an appeal with the BZA.

---

4. "Under roof" is defined in the zoning regulations as the "stage of completion of a structure or part thereof when the main roof of the structure or part thereof, and the roofs of any structures on the main roof or part thereof, are in place." 11 DCMR § 3112.2(b)(1).

5. According to petitioners, they "made known [their] concerns about the potential illegality of this building—from before ground was even broken on the construction to the days before and after the units were put up for sale."

6. The ANC resolution cited 11 DCMR § 401.3, which (in an accompanying table) provides that in the case of a "conversion to apartment house" in an R–4 zone, the minimum lot size shall be 900 square feet per apartment. The ANC asserted that approval of the Irving Street building would "eliminate the very foundation of an R–4 District," and that allowing the issuance of a certificate of occupancy would set a "precedent [that] would be catastrophic" for R–4 neighborhoods.

On June 10, 2005, DCRA issued a certificate of occupancy for the Irving Street building. Thereafter, petitioner Basken and intervenors attempted to negotiate a monetary settlement with respect to the property. Petitioners also sought information from DCRA and from Councilmember Graham's office about when an appeal to the BZA would have to be filed.[7] Intervenors' counsel Frederic Press,[8] with whom petitioner Basken had been corresponding as part of the settlement discussions, told Basken in an email that "you have until August 10[, 2005] to file an appeal [with the BZA]." Petitioners contend that they received a similar answer from BZA staff in response to their inquiries about the deadline for appealing to the BZA.

No settlement was achieved, and, after the ANC decided at a July 22, 2005 public meeting not to file an appeal with the BZA, petitioners went on to submit to the BZA their "Appeal of DCRA Permits for 1636 Irving St. NW." Their notice of appeal is dated August 3, 2005, and a date stamp indicates that it was received by the BZA on August 5, 2005. In the notice of appeal, petitioners stated that they were challenging the June 10, 2005 certificate of occupancy as well as the first building permit and the revised building permit. They further stated that:

We are appealing the decision that the existing structure at 1636 Irving Street N.W.—in an R4 residential zone—be allowed to expand from four rental properties into a seven-unit condominium complex. Developer 1636 Irving St. LLC received building permits for seven units, "subject to zoning approval of number of units in zone," (permit B468513) and later, certificate of occupancy for seven units.

In a letter accompanying the notice of appeal, petitioners explained their "primary allegation" that the permits allowing the conversion of the Irving Street building into seven units were inconsistent with the zoning regulations. Petitioners also asserted that, with its rear addition, the Irving Street building exceeds the maximum lot occupancy permitted under zoning regulations (citing specifically 11 DCMR § 403.2) and appears to be in violation of 11 DCMR § 405.6 (which provides generally that if a side yard is provided in an R–4 district, "it shall be at least three inches (3 in.) wide per foot of height of building, but not less than eight feet (8 ft.) wide").

On August 29, 2005, intervenors filed a motion asking the BZA to dismiss petitioners' appeal as untimely filed. Intervenors cited the sixty-day appeal period established by 11 DCMR § 3112.2(a),[9] and

7. Petitioners told the BZA that they "never got an answer" to their inquiries. However, on July 13, 2005, Director Canavan sent a letter to Councilmember Graham, with a copy to petitioner Basken, answering questions that had been raised by Basken about, *inter alia*, the time for filing a petition with the BZA. Director Canavan responded to the question "What is your understanding of the last date at which any interested party could file for a BZA appeal of your decisions in this case?" by quoting 11 DCMR §§ 3112.1 and 3112.2(a) (stating, in pertinent part, that "[a]n appeal shall be filed within sixty (60) days from the date the person appealing the administrative decision had notice or knowledge

of the decision complained of, or reasonably should have had notice or knowledge of the decision complained of, whichever is earlier").

8. Intervenors have described Mr. Press as their "transactional lawyer" and their "real estate lawyer in Maryland."

9. 11 DCMR § 3112.2 provides in full as follows:

Any person aggrieved by any order, requirement, decision, determination, or refusal made by an administrative officer or body, including the Mayor of the District of Columbia, in the administration or enforce-

pointed out that it was "not until almost 8 months after the issuance of the last of the challenged building permits" and "70 days after appellants had notice and knowledge about DCRA's decision [announced in Director Canavan's May 26, 2005 letter] to issue a certificate of occupancy that the appeal was lodged." Intervenors argued that "the zoning review issues were encompassed within the building permit" and that the certificate of occupancy "did not present any new zoning review issues" that could be addressed in petitioners' August 5, 2005 appeal. Petitioners argued that, in light of the mere conditional or tentative approval set out on the face of the revised building permit, the appeal period did not begin to run until DCRA had made a final decision on the "zoning approval of number of units in zone" issue. Notice of that final decision, petitioners contended, came through the certificate of occupancy that was issued on June 10, 2005. Because the appeal to the BZA was filed within sixty days after June 10, 2005, petitioners argued, the appeal was timely.

At its September 20, 2005 public meeting, the BZA heard arguments on the motion to dismiss.[10] At a September 27, 2005 meeting, BZA members voted unanimously to dismiss the appeal for lack of timeliness, and the BZA issued a written Decision and Order on March 23, 2006, that largely tracked the rationale that BZA members set out in their September 27, 2005 oral ruling. The BZA stated in its written decision that "the error complained of," *i.e.*, that the Irving Street building "be allowed to expand from four rental properties into a seven-unit condominium com-

ment of the Zoning Regulations may file a timely appeal with the Board as follows:

(a) An appeal shall be filed within sixty (60) days from the date the person appealing the administrative decision had notice or knowledge of the decision complained of, or reasonably should have had notice or knowledge of the decision complained of, whichever is earlier.

(b) If the decision complained of involves the erection, construction, reconstruction, conversion, or alteration of a structure or part thereof, the following subparagraphs shall establish the latest date on which an appeal may be filed:

(1) No appeal shall be filed later than ten (10) days after the date on which the structure or part thereof in question is under roof. For purposes of this subparagraph, the phrase "under roof" means the stage of completion of a structure or part thereof when the main roof of the structure or part thereof, and the roofs of any structures on the main roof or part thereof, are in place; and

(2) The provisions of paragraph (b) of this subsection shall not relieve an appellant of the jurisdictional requirement in paragraph (a) of this subsection of filing a timely appeal.

(c) Notwithstanding paragraphs (a) and (b) of this subsection, for purposes of establish-

ing the timeliness of an appeal under this subsection, an appellant shall have a minimum of sixty (60) days from the date of the administrative decision complained of in which to file an appeal.

(d) The Board may extend the sixty-(60) day deadline for the filing of an appeal only if the appellant demonstrates that:

(1) There are exceptional circumstances that are outside of the appellant's control and could not have been reasonably anticipated that substantially impaired the appellant's ability to file an appeal to the Board; and

(2) The extension of time will not prejudice the parties to the appeal, as identified in § 3199.1.

10. The BZA's questions focused in part on the language in the revised building permit that stated "subject to zoning approval of number of units in zone." Intervenors' zoning counsel stated that he did not know the meaning of the language, and had never before seen such language on a building permit. Petitioners asserted that DCRA officials had informed them that the construction was proceeding at the developers' risk, and that DCRA would not issue a certificate of occupancy if the building did not conform with zoning requirements.

plex," was made "in the issuance of" the revised building permit. It reasoned that under 11 DCMR § 3112.2(a), the last date for a timely appeal was February 15, 2005, which was sixty days after the December 17, 2004 issuance date of the revised building permit. However, it considered the argument that there was "confusing" language on the revised building permit, and considered whether that might be regarded as an exceptional circumstance that warranted an extension of the appeal deadline under 11 DCMR § 3112.2(d).

The BZA reasoned that "[e]ven if the Board were to find that [petitioners'] confusion was both reasonable and an extenuating circumstance beyond their control that impaired their ability to file an appeal[,] that circumstance ended on May 26, 2005," the date of Director Canavan's letter to ANC 1–D. The BZA noted that petitioners "had actual knowledge of that letter as indicated by Mr. Basken's email of May 27, 2005," and concluded that "there can be no doubt that by May 27, 2005, [petitioners] knew that it was time to appeal," rejecting petitioners' argument that the May 26, 2005 letter created uncertainty regarding their appeal rights.[11]

The BZA reasoned that "[t]he question then becomes what amount of time should be allowed for an appeal after the extenuating circumstances end," and concluded that while section 3112.2(d) "is silent on this issue, . . . certainly the rule could not be reasonably interpreted as permitting more than the 60 days permitted in the absence of a reasonable basis for delay." The BZA concluded that petitioners' appeal had to be filed by July 26, 2005, sixty days after May 27, 2005, a date that the BZA Chair observed was "the most liberal construction of the time line that pushed this as far out as possible."

Responding to petitioners' argument that they were misled by intervenors' counsel, the BZA found that this did not rise to the level of a further exceptional circumstance that impaired petitioners' ability to appeal.[12] Finally, the BZA reasoned that June 10, 2005, the date when the certificate of occupancy was issued, did not start the time to appeal the zoning decision, because "DCRA made no additional zoning decisions when it issued the C of O."[13] The BZA found that the certificate of occupancy was not the "decision . . . associated with the zoning error complained of."

There followed the instant petition for review.

## II.  Standard of Review

■ In reviewing BZA decisions, we "will defer to the Board's findings and will not second-guess the Board's decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 925 A.2d 585, 589 (D.C.2007) (in-

11.  Similarly, at the September 27, 2005 meeting, BZA members observed that in the May 26, 2005 letter, DCRA had "stated clearly" that the Zoning Administrator would not deny the certificate of occupancy, and reasoned that by May 27, 2005, petitioners "knew that there was a final decision and [that] they had a right to appeal."

12.  The BZA noted in its written order that petitioners "were represented by counsel who were not hindered from researching beyond

these statements and determining the deadlines for filing a timely appeal." In its oral ruling, the BZA also responded to petitioners' claim that BZA staff had told them they could wait to appeal, observing that "there isn't any documentation of that."

13.  In its oral ruling, the BZA observed that "the certificate of occupancy didn't raise any new zoning issues" and added "no new information."

ternal citations omitted). We will uphold the BZA's factual findings "if they are based on substantial evidence in the record as a whole." *Kalorama Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 934 A.2d 393, 400 (D.C.2007), quoting *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 831 A.2d 921, 931 (D.C.2003), and D.C.Code § 2–510(a) (2001). "We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute." *Kuri Bros. v. District of Columbia Bd. of Zoning Adjustment,* 891 A.2d 241, 244 (D.C.2006); *see also Downtown Cluster of Congregations v. District of Columbia Bd. of Zoning Adjustment,* 675 A.2d 484, 491 (D.C.1996) (stating the BZA's interpretation of the zoning regulations is controlling "unless plainly erroneous or inconsistent with the regulation"). "[A]lthough we accord weight to the [BZA's] construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court." *George Washington Univ.,* 831 A.2d at 931.

### III. Analysis

**A. Timeliness of Petitioner's Appeal on the Lot Occupancy and Side–Yard Setback Issues**

We address first petitioners' argument that a remand is necessary because the BZA failed to make a finding as to whether petitioners' appeal to the BZA was timely with respect to their challenge to the lot occupancy and side-yard setback issues. Petitioners are correct that the BZA made no finding as to these issues, but the record makes clear that it was the first building permit, issued on September 9, 2004, that allowed intervenors to increase the Irving Street building's footprint, *i.e.,* its size and lot occupancy (and also permitted the expansion from three to four units). Petitioners have not claimed that the first building permit contained confusing or ambiguous language that impaired their ability to appeal, but they do assert that DCRA did not respond to their requests for a copy of the approved building plans, and that this prevented them from recognizing the alleged violations in time to meet the appeal deadline established by 11 DCMR § 3112.2. That may have kept petitioners from appealing within sixty days after the first building permit was issued,[14] but petitioners have cited no reason why they could not have recognized the alleged zoning violations by the time the new construction was under roof (January 15, 2005), and could not have appealed within a short time thereafter. *See* 11 DCMR § 3112.2(b)(1) ("No appeal shall be filed later than ten (10) days after the date on which the structure or part thereof in question is under roof"). Accordingly, we reject their argument that a remand is required as to the lot occupancy percentage and side-yard setback issues. It is plain from the present record that petitioners' August 5, 2005 appeal was not timely as to these issues.[15] The timeliness

14. *Cf. Sisson v. District of Columbia Bd. of Zoning Adjustment,* 805 A.2d 964, 969–70 (D.C.2002) (accepting the BZA's reasoning that because the "full extent of [Mr. Sisson's] construction project could not be discerned as each individual permit was issued ... [the appellant] was not chargeable with notice of the entire scope of work performed at [Mr. Sisson's] property until all of the permits were issued").

15. We note, too, that in their notice of appeal to the BZA, petitioners did not challenge the DCRA decision, evidenced by the first building permit, to allow a fourth rental unit at the Irving Street building (even though petitioners contend that the lot size will allow only three units); rather, they challenged the decision allowing the conversion from four to seven units—suggesting that they understood that their appeal was too late as to the con-

issue that remains is whether petitioners waited too long to appeal the DCRA zoning decision that petitioners assert erroneously approved seven units for the Irving Street building.

## B. Timeliness of Petitioner's Appeal of the Decision to Allow Seven Units

### 1. When Petitioners knew or should have known of the "decision complained of" (and, thus, when the time to appeal began to run)

Ordinarily, the building permit is the document that reflects a zoning decision about whether a proposed structure, and its intended use as described in the permit application, conform to the zoning regulations. *See Schonberger v. District of Columbia Bd. of Zoning Adjustment*, 940 A.2d 159, 161 n. 2 (D.C.2008) (describing the BZA's determination that a building permit "contained the relevant zoning decision"); *Rodgers Bros. Custodial Servs. v. District of Columbia Bd. of Zoning Adjustment*, 846 A.2d 308, 316 (D.C.2004) ("Ordinarily municipalities look to a building permit accompanied by an application and building plans to ensure consistency with zoning regulations," citing ANDERSON'S LAW OF ZONING (4th ed.1996, at 362)); [16] *Sisson*, 805 A.2d at 968 (quoting the BZA's observation that "the [building] permits for

the garage should not have been issued if the garage did not provide access in conformance with the zoning regulations"); *Woodley Park Cmty. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 637–38 (D.C.1985) (reasoning that because building permit had earlier resolved issues as to height, setback and use, these decisions could not be challenged through an appeal of the certificate of occupancy); *see also* 11 DCMR § 3202.1 (providing generally that "a building permit shall not be issued for the proposed erection, construction, conversion, or alteration of any structure unless that structure complies with the provisions of this title [*i.e.*, 'Title 11. Zoning']"). Here, however, as the BZA assumed at least arguendo,[17] the "subject to zoning approval of number of units in zone" language on the revised building permit was "confusing." The Board treated this unusual language as having created an extenuating circumstance that meant that petitioners' time for appealing the decision to permit the conversion to seven units did not expire sixty days after the revised building permit was issued on December 17, 2004.[18]

We review *de novo* the issue of whether the revised building permit was in fact ambiguous. *See Concord Enters. v. Binder*, 710 A.2d 219, 223 (D.C.1998) (not-

---

version approval reflected in the first building permit.

To the extent that petitioners' issue is whether the as-built addition conforms to the approved plans, their concern raises a potential enforcement issue (that should be directed to DCRA), rather than a zoning issue, as was recognized during the BZA hearing.

**16.** However, where " 'uses may be commenced or changed without construction or alteration which requires a building permit, and such uses or changes may be in violation of the zoning regulations, most municipalities undertake to plug this gap through the use of occupancy permits.' " *Rodgers Bros.*, 846

A.2d at 316–17 (citation omitted). In other words, where there is a proposed change in use that does not entail new construction for which a building permit is required, the certificate of occupancy may be the first evidence of zoning approval for the change in use.

**17.** The BZA began its analysis of exceptional circumstances with "even if we assume" language.

**18.** *Cf. Sisson*, 805 A.2d at 971 (reasoning that where building permits were "faulty on their face," the extraordinary circumstances exception applied).

ing that this court reviews de novo whether a writing is ambiguous, which is a question of law); *see also American Bldg. Maint. Co. v. L'Enfant Plaza Props.*, 655 A.2d 858, 861 (D.C.1995); *Clyburn v. 1411 K St. Ltd. P'ship*, 628 A.2d 1015, 1017 (D.C.1993). We conclude that the revised building permit was ambiguous, because it appears to evidence both zoning approval of the conversion to seven units and a decision to defer approval of the conversion to seven units.[19] We conclude, therefore, that the revised building permit failed to afford notice of the zoning decision with respect to the conversion to seven units, and that issuance of the revised permit did not trigger the sixty-day appeal period.[20] *Cf. Donnelly Assocs. v. District of Columbia Historic Pres. Review Bd.*, 520 A.2d 270, 275 (D.C.1987) (reasoning that Review Board's oral vote was "ambiguous evidence of the intent to utter a final decision," that the ambiguity was resolved when the Review Board thereafter issued a written decision, and that the written decision began the fifteen-day period for filing a petition for review). This conclusion is consistent with our case law establishing that "[i]n situations where ambiguity exists regarding the date of an order or decision," we

will "resolve[ ] the ambiguity in favor of the party seeking review." *Askin v. District of Columbia Rental Hous. Comm'n*, 521 A.2d 669, 675 (D.C.1987); *see also In re D.R.*, 541 A.2d 1260, 1264 (D.C.1988) ("In [ ] areas of administrative law, we have emphasized the importance of eliminating ambiguity, and, where we have found ambiguity, we have construed it against the government agency that drafted the language").

■ In contrast, we conclude that there was no ambiguity in Director Canavan's May 26, 2005 letter, a copy of which petitioners had seen by May 27, 2005.[21] We agree with the BZA that Director Canavan's letter stated clearly that the zoning decision had been made: the Zoning Administrator would not deny the certificate of occupancy on the basis of the acknowledged zoning review errors.[22] The letter referenced the ANC's right to appeal to the BZA, also an unambiguous signal that the decision was made. Moreover, by May 27, 2005, petitioners understood the letter as "invit[ing] an appeal to the BZA for a decision on how to resolve the matter." Indeed, petitioner Basken

19. The "subject to zoning approval" language at least arguably made it reasonable for petitioners to rely on the advice that they say they received from DCRA, *i.e.*, that DCRA "would wait until completion of the project before making final determinations on its legality."

20. Thus, we do not agree with the BZA that the "error complained of" was definitive as of issuance of the revised building permit. Nonetheless, we agree with the result of the BZA's approach, *i.e.*, treating the permit's "confusing" language as an exceptional circumstance that warranted extending the appeal deadline to a date beyond the sixtieth day after the revised building permit was issued.

21. As we have observed, a writing "is ambiguous if, on its face, it has more than one reasonable interpretation," *Beck v. Continental Cas. Co. (In re May)*, 936 A.2d 747, 751

(D.C.2007), but "is not ambiguous merely because the parties disagree over its meaning." *Id.*

22. Drawing inferences from DCRA correspondence that was not part of the administrative record, petitioners argue that Director Canavan's letter signified only that a certificate of occupancy would not be denied on the basis of any zoning review errors relating to the lot occupancy issue, and that a final zoning decision was still pending on the issue of seven units. We are not persuaded by this argument, because the issue of whether the Irving Street building could have seven units was the sole focus of the ANC 1–D resolution to which Director Canavan's May 26, 2005 letter responded.

immediately began to urge the ANC and the Historical Society to appeal.

Further, and importantly for our decision, the zoning statute and regulations do not tie the time for appealing to the BZA to the issuance of a specified type of notice. *See* D.C.Code § 6–641.07(f) (authorizing appeals from "any other administrative decision") and 11 DCMR § 3112.2 (providing for an appeal by any person aggrieved by "any· order, requirement, decision, determination, or refusal" within sixty days from the date the person knew or reasonably should have known of "the decision complained of"). In addition, our case law specifically recognizes that a letter from DCRA or the Zoning Administrator conveying a zoning decision may be an appealable decision, *see Goto v. District of Columbia Bd. of Zoning Adjustment,* 423 A.2d 917, 924 (D.C.1980) (upholding BZA decision that "began to run the clock with [Zoning Administrator] Fahey's letter of January 6, 1976"), and may start the time for appeal by a person who has notice of the letter. *See Bannum, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 894 A.2d 423, 430 n. 10 (D.C.2006) (not disturbing BZA conclusion that Zoning Administrator's concurrence letters issued to Bannum, Inc. were appealable, but reasoning that the letters could not start the time for appeal by the ANC because it was "by no means clear that the ANC had notice of the concurrence letters at the time they were issued").

Because Director Canavan's May 25, 2006 letter was not ambiguous, and in light of all the foregoing, we must defer to the BZA's interpretation that this letter was the "order, requirement, decision, determination, or refusal ... complained of," 11 DCMR § 3112.2(a), that allowed the clock to begin running on petitioners' sixty-day period for appealing to the BZA with respect to use of the Irving Street building as a seven-unit building. *See Goto,* 423 A.2d at 924 (reasoning that because "we conclude it was not clearly wrong for the Board to calculate timeliness of [the] appeal by reference to the written order[,] ... we defer to that interpretation"). And, as the BZA put it, "there can be no doubt that by May 27, 2005, [petitioners] knew that it was time to appeal." [23]

### 2. Significance of the certificate of occupancy for time to appeal.

Petitioners' contention is that the appeal period began to run on the date when the certificate of occupancy was issued. They are correct that the issuance of a certificate of occupancy is an appealable event. *See* D.C.Code § 6–641.07(f) (authorizing appeals to the BZA from "any decision ... granting or refusing a building permit or granting or withholding a certificate of occupancy, or any other administrative decision based in whole or in part upon any zoning regulation or map ...."); *see also* 12A DCMR § 110.6 ("Any person aggrieved by the action of the Director

---

**23.** Petitioners urge that the BZA's findings are entitled to "less deference" because the BZA made them without an evidentiary hearing. However, the material facts that we rely on—the content of Director Canavan's May 26, 2005 letter, petitioners' knowledge of that letter by May 27, 2005, and petitioner Basken's May 27, 2005 email to petitioner Meyer and others, urging the ANC and the Historical Society to appeal—are undisputed. The question of whether, upon these facts, petitioners knew or reasonably should have known of the DCRA zoning decision is a question of law that we review de novo. *Cf. Wilson v. Devonshire Realty,* 307 Ill.App.3d 801, 805, 241 Ill.Dec. 129, 718 N.E.2d 700 (1999) ("[t]he question of when a party knew or reasonably should have known of both an injury and its wrongful cause becomes a question of law ... when only one conclusion can be drawn from the undisputed facts"); *Vic Hansen & Sons v. Office of Comm'r of Transp.,* 133 Wis.2d 450, 395 N.W.2d 631, 635 (Ct.App.1986) (same).

granting, withholding, or revoking a Certificate of Occupancy may appeal the action to the Board of Zoning Adjustment"). This makes sense because a certificate of occupancy may evidence a decision that is different from any that has come before with respect to a project. For example, a certificate of occupancy evidences a determination—and in most cases, we presume, is the first notice to the public—that "renovation of a structure has been completed in conformity with the earlier application for a building permit...." *Tri County Indus. v. District of Columbia*, 339 U.S.App. D.C. 378, 380, 200 F.3d 836, 838 n. 1 (D.C.Cir.), amended, 2000 U.S.App. LEXIS 12831 (D.C.Cir.2000); *cf. Boatman v. Town of Oakland*, 76 F.3d 341, 342 (11th Cir.1996) (noting that after obtaining a permit to build a "manufactured home," petitioners sought but were refused a certificate of occupancy for the as-built structure, because the inspector found that they had constructed a "mobile home" that was in violation of a zoning ordinance).

Further, as explained earlier, see note 16, *supra*, a certificate of occupancy may provide the first notice of zoning approval for a proposed use of a building (such as when there was no new construction that required a building permit). A certificate of occupancy may also be the first evidence of zoning approval for a project to differ from what was previously approved. *See Woodley Park*, 490 A.2d at 636 (noting

that plans approved as part of the building permit for a hotel provided for 798 parking spaces, but that revised plans submitted with application for certificate of occupancy provided for only 595 parking spaces, and that a partial occupancy certificate that incorporated the new parking calculations was issued after the "Zoning Administrator agreed ... that only 579 parking spaces were required to meet the requirements of the zoning regulations").

Our case law establishes that a certificate of occupancy is separately appealable where it provides the first notice from which an aggrieved person knew or "reasonably should have ... know[n]," 11 DCMR § 3112.2(a), of the resolution or decision that the certificate represents. *See Woodley Park*, 490 A.2d at 637 (appeal filed within thirty days after certificate of occupancy was issued was timely as to issue of required number of parking spaces at hotel because petitioners were not "chargeable with notice" of the Zoning Administrator's approval of a reduced number of spaces until the certificate was issued, but appeal was untimely as to height, setback and use issues that had been resolved a year earlier through issuance of building permit).[24] A certificate of occupancy does not, however, start another sixty-day appeal period as to any and all DCRA zoning decisions affecting a project that preceded issuance of the certificate.[25]

---

24. Thus, for example, if a certificate of occupancy had been issued for the Irving Street building over objections that, as completed, it failed to meet building code requirements, *see* 12A DCMR § 101.2.3, an appeal of the certificate of occupancy on that basis would have been timely if taken within sixty days of issuance of the certificate. A failure to meet building code requirements is an example of what petitioners describe as "a whole host of other reasons [why] there could [have been] a subsequent decision to deny" a certificate of occupancy for the Irving Street building.

25. Relying on 12A DCMR § 110.1, petitioners assert that the certificate of occupancy "signifies that 'the use complies with the Zoning Regulations,'" and argue that the certificate of occupancy represents a final zoning decision. However, section 110.1 states in pertinent part only that "no person shall use any structure, land, or part thereof for any purpose other than a one-family dwelling until a Certificate of Occupancy has been issued to that person stating that the use complies with the Zoning Regulations and related building, electrical, plumbing, mechanical and fire pre-

If that were so, every zoning determination that preceded issuance of a building permit would effectively be subject to review again at the certificate-of-occupancy stage, and no property owner could ever have assurance that a building project would not be stopped in its tracks at the last minute. We conclude that the BZA did not clearly err in finding that an appealable zoning decision on the issue of seven units was made by May 26, 2005, and that the certificate of occupancy represented neither a new decision on this issue nor the present petitioners' earliest notice of the decision. Moreover, nothing in the record supports a conclusion that the decision was tentative, or that petitioners could reasonably have expected that it was subject to change up until the actual issuance of the certificate of occupancy.[26]

### 3. Whether our decision in *Bannum* should control the outcome here

Our decision in *Bannum* does not require a different conclusion. Bannum wrote a letter to DCRA identifying itself as a contractor that constructed and operated community correctional centers ("CCC"'s). The letter quoted the language of 11 DCMR § 801.7(k) (authorizing a "temporary detention or correctional institution on leased property for a period not to exceed three (3) years"), and asserted that a CCC that Bannum proposed to build could operate as a matter of right in its proposed location. The letter requested DCRA's concurrence with that interpretation of the regulation, but did not provide (and DCRA did not ask for) any details regarding the nature of the CCC that Bannum proposed to build or how long it would be in operation. *See* 894 A.2d at 427. The "Zoning Administrator signed off on the dotted line on the same sheet of paper and mailed it back to Bannum the same day." *Id.* Several months later, Bannum sent another, virtually identical "concurrence letter" to DCRA, again without details about the proposed CCC, and the Zoning Administrator again signed off on it. *Id.* Sometime thereafter, DCRA issued to Bannum a building permit to construct and operate a 150–bed CCC, and about a month later, issued a revised

---

vention requirements;" *see also Tri County,* 339 U.S.App. D.C. at 380 n. 1, 200 F.3d at 838 n. 1 ("A certificate of occupancy is issued when renovation of a structure has been completed in conformity with the earlier application for a building permit and the building is found to be in compliance with applicable zoning regulations and the building code"). We read section 110.1 to imply that a certificate of occupancy follows and is evidence of a zoning decision (and, we assume, a certificate of occupancy may often be a party's first notice that a zoning decision has been made). We do not read section 110.1 to say that the certificate of occupancy *is* the final zoning decision, or that there is no zoning decision until a certificate of occupancy has been issued. And, as we have discussed, in this case, the certificate of occupancy was not petitioners' first notice of the zoning decision in issue. Even if, as petitioners apparently would argue, DCRA reneged on an assurance that no certificate of occupancy would issue unless there was strict compliance with zoning regu-

lations, Director Canavan's May 26, 2005 letter made the renege apparent.

**26.** In its written order, the BZA found that "DCRA made no additional zoning decisions when it issued the C of O," adding that "the issuance of the C of O reflects only an administrative judgment of what was fair and equitable in light of the zoning error that had been made." Petitioners read the latter statement as an acknowledgment that the certificate of occupancy was an additional zoning decision, which their appeal timely challenged. We do not agree with that reading. We read the BZA's statement as conveying its interpretation that the certificate of occupancy reflected the decision announced earlier in Director Canavan's May 26, 2005 letter. But even if petitioners are correct that the BZA found that the certificate of occupancy represents the written decision in which DCRA first gave notice of its decision of what was fair and equitable, we would reject that finding as not supported by the record.

permit. ANC 5–B then appealed to the BZA from the DCRA's issuance of both the original building permit and the revised building permit. *Id.* at 427–28.

Bannum argued that because the ANC failed to appeal within sixty days from issuance of the "concurrence letters," its appeal was untimely. *Id.* at 430. The BZA ruled that the letters were appealable as "other administrative decisions," but concluded that " 'separate appeals' from concurrence letters and building permits should be allowed." *Id.* at 430 n. 9. Among other things, the BZA reasoned that "[t]here is no doubt that the two concurrence letters are decisions, but not decisions to grant a building permit." *Id.*

We concluded that we "need not decide whether the concurrence letters were separately appealable," but agreed with the BZA that "the ANC's failure to appeal from a concurrence letter, 'even after notice, does not bar a subsequent appeal of the related building permit.' " *Id.* at 430. We explained that "[b]ecause the issuance of a building permit requires the DCRA to comply with the public notice and other requirements set forth in the zoning regulations, we hold that a party such as ANC 5–B may wait to appeal until the DCRA takes official action by issuing the permit, regardless of whether or not that party has appealed (or tried to appeal) from any earlier interlocutory 'administrative decision.' " [27] *Id.* at 430. We also reasoned that it was "by no means clear that the ANC had notice of the concurrence letters at the time they were issued . . . and there was testimony indicating that Bannum never even advised ANC 5–B of the let-

ters," and concluded that "[t]he ANC surely cannot be required, or even expected, to appeal from an 'administrative decision' of which it had no notice." *Id.* at 430 n. 10.

*Bannum* is unavailing to the petitioners here. Unlike the ANC that sought BZA review in that case, petitioners here were not entitled to formal notice that permitted them to wait for issuance of a permit (here, an occupancy permit) before their time to appeal the underlying zoning decision began to run. It is also clear that, unlike the ANC in *Bannum,* petitioners did have notice of the DCRA letter (Director Canavan's May 26, 2005 letter), within a day after it was signed. And while the BZA found that the "interlocutory" concurrence letters in *Bannum* did not signify "decisions to grant a building permit," Director Canavan's letter clearly signified a decision not to withhold a certificate of occupancy allowing the Irving Street building to have seven units. Further, the concurrence letters in *Bannum* were issued by DCRA without information about the details of Bannum's proposed facility and thus, unlike the subsequent building permits that the ANC appealed, were not decisions approving the particulars of Bannum's facility; by contrast, Director Canavan's letter was issued after DCRA had been fully briefed on how the conversion of the Irving Street building to a seven-unit building conflicted with the zoning regulations applicable to R4 districts, so that it represented a decision on the very issue that petitioners asked the BZA to review. In light of all of these differences, *Bannum* does not require us to hold that the June 10, 2005 certificate of

27. *See* D.C.Code § 1–309.10(b) and (c)(1) (providing that each District agency shall "before the formulation of any final policy decision or guideline with respect to . . . licenses, or permits affecting said [Advisory Neighborhood] Commission area," provide "thirty days written notice of the proposed action to each affected Commission of the proposed ac-

tion"); *id.,* § 1–309(c)(3) (providing that DCRA "shall ensure that each Advisory Neighborhood Commission is provided at least twice a month by first-class mail with a current list of applications for construction and demolition permits within the boundaries of that Advisory Neighborhood Commission").

occupancy triggered another opportunity for the petitioners here to appeal DCRA's decision regarding seven units.

### 4. Whether there were extraordinary circumstances that warranted an extension of the time to appeal

■ Having treated the "confusing" language of the revised building permit as an extenuating circumstance that warranted an extension of the time for appealing the issue of seven units at the Irving Street building, and having found that the confusion dissipated by May 27, 2005, the BZA understood its next task to be determining when the extended appeal period ended. The BZA's reasoning was that "certainly [11 DCMR § 3112.2(d)] could not be reasonably interpreted as permitting more than the 60 days permitted in the absence of a reasonable basis for delay." We uphold the BZA's reasoning that the time to appeal ended on the sixtieth day after May 27, 2005, but do so on the basis of slightly different reasoning. Because we are satisfied that it was not until they saw a copy of Director Canavan's May 26, 2005 letter—i.e., by May 27, 2005—that petitioners reasonably should have known of the zoning decision giving final (rather than preliminary or conditional) approval for seven units at the Irving Street building, we conclude that the time to appeal did not begin to run until May 27, 2005, and ended sixty days thereafter,[28] as established by regulation, unless there were exceptional circumstances beyond petitioners' control within that sixty-day period that impaired their ability to file a timely appeal.

We uphold the BZA's discretionary determination that there were no such exceptional circumstances after May 27, 2005, because we cannot find that the conclusion was clearly erroneous.[29] "[T]his court is not to substitute its judgment for that of the agency, and . . . the decision of the BZA will be upheld provided there is a rational basis for it." *Sisson*, 805 A.2d at 970 (quoting *Gladden v. District of Columbia Bd. of Zoning Adjustment*, 659 A.2d 249, 253 (D.C.1995)).

It is undisputed that petitioners were given advice by intervenors' transactional lawyer that they had until August 10, 2005, to file a BZA appeal (although, we note, the record does not show that intervenors' lawyer ever told petitioners precisely what DCRA determination he thought they could appeal on that date). But there is no indication from the record or from the briefs filed in this court that circumstances forced petitioners to rely on the advice they received from a lawyer whose interests were not aligned with their own[30] and, as the BZA found, petitioners were represented by their own lawyer at the time. *Cf. Woodley Park*, 490 A.2d at 638 (observing that "WPCA cannot now escape the harsh consequences of its one-year delay

---

28. As discussed *supra*, petitioners had sixty days after issuance of the certificate of occupancy on June 10, 2005, to appeal as to any issues newly resolved by the certificate, but that did not permit them to challenge the decision allowing the Irving Street building to have seven units.

29. Petitioners assert that extending the deadline from July 26 to August 5 would not have prejudiced intervenors, but 11 DCMR § 3112.2(d) requires both "exceptional circumstances" beyond an appellant's control *and* lack of prejudice for the BZA to extend the time to appeal.

30. As we noted in *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916 (D.C.1992), "[o]ne cannot close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency." 613 A.2d at 934 (quoting *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 672 (N.D.Ga.1982), *aff'd mem. sub nom. Computer Dimensions, Inc. v. Basic Four Corp.*, 747 F.2d 708 (11th Cir.1984)). Moreover, petitioners might have ascertained—by counting sixty days from June 10, 2005—that the advice that intervenors' transactional lawyer gave them, *i.e.*, that they had until August

in appealing because WSC—its adversary in difficult negotiations—was less than fully candid. While the circumstances presented here certainly make WPCA's one-year delay in appealing the building permit understandable, they do not make it reasonable for purposes of timeliness," and holding that WPCA's appeal was untimely even though "the Zoning Administrator informed the Task Force that nothing could be done until WSC applied for certificates of occupancy").

Further, although petitioners claim that they received advice from BZA staff that August 10, 2005, was the appeal deadline, we have no basis for second-guessing the BZA's decision not to rely on that claim (which remains "undocumented"). We note, moreover, that it would have been unreasonable for petitioners to rely on anyone who was not in a position to understand the full context of the question presented—a context that included Director Canavan's May 26, 2005 letter, petitioners' receipt of a copy of that letter by May 27, 2005, and the ANC 1–D resolution to which the letter responded. Petitioners do

not tell us precisely what they asked and what background information they provided in making their inquiries about the appeal deadline. Also, petitioners' account of their repeated inquiries about the appeal deadline suggests that they appreciated that the answer was not as simple as counting sixty days from the date when the certificate of occupancy was issued. Finally, as the BZA observed, the record reveals no reason why petitioners could not have filed their appeal sooner than they did, and by July 26, 2005, at the latest.[31]

## IV. Conclusion

We agree with BZA members that the timeliness issues in this case present "a difficult situation."[32] But, for all the foregoing reasons, we are constrained to uphold the BZA's ruling that petitioners' appeal was untimely.

*Affirmed.*

10 to file their appeal, was not to be relied on. As the BZA noted in its written order, "August 10, 2005 was the *61st* day after the C of O was issued" (italics added); the sixtieth day would have been August 9.

**31.** As this court has previously observed, "because deadlines for taking appeals serve important ends, they should not be extended without good cause." *Waste Mgmt. of Md. v. State Bd. of Zoning Adjustment,* 775 A.2d 1117, 1122 (D.C.2001).

**32.** We say this because, although petitioners delayed in filing their appeal to the BZA, this is not a case in which they waited in ambush and protested the construction and remodeling at the Irving Street building only after intervenors had invested significant resources. Quite the contrary, the record reveals that petitioners not only complained to public officials, but also sought work stoppages and published a community-wide letter de-

crying the project. Moreover, DCRA Director Canavan expressed agreement that, with respect to zoning decisions about the building project, there were "gross mistakes ... made at the highest level of the zoning administration." The record reflects that zoning officials lost their jobs as a result, and petitioners' submission to the BZA alludes to allegations of illegal payments made to obtain building permits. Finally—although we do not discount the possibility that intervenors have good faith and potentially meritorious arguments about why their conversion of the Irving Street building to a seven-unit condominium did not violate the zoning regulations—intervenors at least knew that their project raised legal issues and that they were proceeding at some risk of having to undo their work.

At the same time, we share the BZA Chair's puzzlement about "how could [petitioners] be standing there watching it constructed" without coming to the BZA.