Frank and Constandina
**ECONOMIDES,**
Petitioners,

v.

**DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,**
**Respondent,**

and

**Patrick J. Carome, and National Park
Service United States Department
of the Interior, Intervenors.**

No. 06–AA–1381.

District of Columbia Court of Appeals.

Argued April 2, 2008.
Decided Aug. 14, 2008.

---

Paul J. Kiernan, with whom Norman M. Glasgow, Jr., Mary Carolyn Brown, and Richard L. Aguglia, Washington, DC, were on the brief for petitioners.

Stacy L. Anderson, Assistant Attorney General, with whom Linda Singer, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, was on the brief for respondent.

Jonathan G. Cedarbaum, with whom Adam S. Aderton, Washington, DC, was on the brief, for intervenor Patrick J. Carome.

Daniel F. Van Horn, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief for intervenor National Park Service.

Before REID and KRAMER, Associate Judges, and SCHWELB, Senior Judge.

KRAMER, Associate Judge:

The core issue before us in this petition for review is: What is a retaining wall? Petitioners Frank and Constandina Economides posit that what they built as an improvement to their residential property was nothing more than a retaining wall constructed pursuant to a permit issued by the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"). Respondent, the District of Columbia Board of Zoning Adjustment ("BZA"), along with intervenors, the National Park Service (a component of the U.S. Department of the Interior) and Patrick Carome, see more than a retaining wall. What they see is an aesthetically displeasing "structure" that violates the zoning laws of the District of Columbia and was built pursuant to an improperly issued permit. The BZA ruled in favor of Carome. We find its reasoning to be sound and affirm its decision.

## I. The Facts

### A. The Parties

Petitioners Frank and Constandina Economides ("the Economides") reside at 4825 Dexter Terrace in the Northwest sector of Washington. Their property, 25,811 square feet in size, is located within the Wesley Heights Overlay District (the "WHOD"). The WHOD was established *inter alia* "to preserve and enhance the low density character of Wesley Heights by regulating construction and alteration of residential and other buildings in the area," 11 DCMR § 1541.1 (2008). Between 2002 and 2005, the Economides had substantial construction work done on their property. Its rear boundary abuts Wesley Heights Park, and in its natural state before the construction, sloped downward and away from their house.

Intervenor Patrick Carome resides at 4747 Fulton Street, also in the Northwest sector of Washington. Wesley Heights Park is on the other side of Fulton Street, and extends from there to the Economides' property line on the opposite side of the Park. Respondent, the BZA, ruled in favor of Carome at the conclusion of his appeal of the DCRA's issuance of construction permits relating to the erection of a structure described in greater detail below.

The Park Service intervened before the BZA and again before this court because Wesley Heights Park is a national reservation and, specifically, because of its con-

cern that the structure built on the Economides property "is likely unsound and therefore may pose a threat to public health and safety within the park." It also contends that the structure will have a "negative impact" upon "parklands and resources" and has expressed concern that the "structure's integrity [is] dependent on there being little or no ground disturbing activity on parkland in the vicinity of the wall."[1]

## B. The Permits

On August 28, 2002, the Economides filed an application with the DCRA for a permit to fill and re-grade the rear yard of their property on Dexter Terrace. The DCRA issued the permit (No. B422839). On February 23, 2004, the Economides applied for an additional permit to enable them to construct a "new retaining wall" around their rear yard. While the application did not discuss the use of synthetic geogrid fabric sheets and compacted fill dirt, it did make clear that concrete "mesa" blocks were going to be used to build a wall that at places could reach as high as thirty feet.[2] The DCRA granted that application as well, and issued a second permit (No. B460927).

## C. The Construction

In 2002, pursuant to permit No. B422839, the Economides began to fill and

re-grade their rear yard, presumably to eliminate the steep slope in the yard and make it more usable for recreational activities. They eventually decided to extend the filling and re-grading project to the end of their rear yard, but concluded they would need a wall to stabilize the massive amounts of fill dirt that would be required. The plans for the Economides' project outlined the four sections of the mesa block wall that would be built, with one section's wall rising just over thirty feet above the ground. DCRA permit No. B460927 allowed the Economides to "construct new retaining wall around rear yard as per plans" provided the wall was built "entirely on owner's land." Construction began in June of 2004 and was completed in late October 2004.

The retaining wall ultimately built was 370 feet in length and divided into four sections. It supported a flat surface of approximately 14,975 square feet in area and occupied most of the yard. Roughly twenty geogrid sheets were layered within the fill dirt that was compacted with gravel inserted between the dirt and geogrids and the wall. The mesa blocks used to build the wall were laid so that the outer blocks of each course were set back slightly from the facade, creating a tapered and minimally stepped appearance. To create this

---

1. In its submission to the BZA in connection with the appeal, the Park Service represented that the foundation or "footer" supporting the structure "is comprised of two components: (1) a gravel base that extends in front of the wall, and (2) Park Service property that the wall relies on for structural support." The Park Service contends that the encroachment of the footer into the Park made the DCRA's issuance of a permit to build the wall improper, and there is evidence in the record to substantiate that claim, thus demonstrating the Park Service's interest in having the BZA's decision affirmed. The parties, however, have not argued this point.

2. Geogrid is a high density polyethylene or polyester fabric that, when placed between layers of soil and joined to a retaining wall, creates cohesion among loose soil particles for durable soil reinforcement, ties the wall into the surrounding landscape, and increases the strength of the wall. As the record indicates, with a stack of geogrids and fill dirt, an outer wall (or veneer)—here of "mesa" concrete blocks made of Portland Cement—can be assembled along the perimeter of the stack, with the stack insuring the wall's stability.

effect, several thousand cubic yards of fill dirt were trucked onto the property, then compacted and layered with geogrid sheets. The artificially elevated surface extended back from the rear of the dwelling to the wall, thus leaving the rear yard with no slope. The wall, in accordance with the plans, was as high as thirty feet in some places, meaning that its grading at those points differed by as much as thirty feet from the original grade and that of adjacent properties. During construction, a silt-collecting fence was erected directly in front of the wall.

Specialized Engineering, an engineering firm hired by the Economides to provide daily monitoring of the construction of the wall, verified on December 15, 2004, that the wall had been satisfactorily completed according to the plans and specifications. An engineer licensed in the District of Columbia also certified that the retaining wall had been constructed according to the applicable law.

D. The Appeal

■ On December 13, 2004, with the support of Advisory Neighborhood Commission ("ANC") 3D,[3] Carome filed his appeal from the DCRA's issuance of the permit. He argued that what the Economides had built in their yard was a "structure"[4] that violated Zoning Regulations by occupying more than 50% of the

yard. Because, he contended, it was a structure and not a retaining wall, it also violated the Zoning Regulations' prohibition against any structure more than four feet higher than the grade from being built in a yard; the WHOD's limit of 30% lot occupancy for any structure; and one of the WHOD's stated aesthetic goals, that is, "[p]reserving existing trees, access to air and light, and the harmonious design and attractive appearance of the neighborhood." See 11 DCMR § 1541.3(c).[5] He sought reversal of the decision issuing the building permit, as well as the removal of the wall and the filled interior portion at the Economides' expense. This was to be done, Carome urged, (1) "without causing any further environmental damage to Wesley Heights/Rock Creek Park or other surrounding properties or the Potomac River watershed," (2) with the subject property ultimately "returned to its previous natural condition," and (3) with various injunctions to be placed upon the Economides' ability to sell or transfer their property, or to construct anything on that property or any other in the District of Columbia "until all zoning violations on the subject property are abated."[6]

The BZA heard the appeal over the course of several dates between March and May of 2005, ultimately ruling in Carome's favor by a vote of four votes to one. The BZA found that "the retaining wall in the

---

3. Written recommendations of ANCs are to be accorded "great weight" by the BZA. See D.C.Code § 1–309.10(d)(3)(A) (2001).

4. Carome's application called it an "Illegal Warehouse–Platform Building."

5. Carome also alleged other statutory violations, but the ones listed herein were the only ones discussed by the BZA's Order, and since he did not file a timely motion to reconsider with respect to those other alleged violations, 11 DCMR § 3126.2, we need not address the merits of those allegations.

6. Shortly after he filed his appeal, Carome received the support of ANC 3D, which unanimously concluded, inter alia, that (1) what the Economides were building was "not in harmony" with the regulations governing the Wesley Heights Overlay District; (2) the retaining wall had a negative impact upon the Wesley Heights Park because the silt accumulation it caused blocked the natural flow of water through the Park and into a stream in an adjacent park; and (3) the permit application had not properly disclosed the Economides' intentions.

rear yard of the subject property is more than just the four vertical mesa block facades surrounding that yard." It also found that "[t]he walls support an artificially elevated surface which together comprise a structure much greater than merely a 'retaining wall.'" This "structure" included the wall, the geogrids and the fill dirt. The purpose of the structure, the BZA opined, was "not to 'resist lateral pressure,'" as a retaining wall is designed to do, "but rather to provide an artificially created surface for leisure activities." Thus construed, the structure built by the Economides violated multiple Zoning Regulations.

Based upon its conclusion that Carome could reasonably have been "unaware of the construction in the rear yard until mid- to late October, 2004," the BZA held that his appeal was timely. It also held that he had standing based on his allegations that "the retaining wall and elevated platform structure constructed on the subject property negatively impact the air and light" his property receives. The BZA's legal conclusion was effectively a reflection of its factual findings as to what was actually built: "the amalgam of the mesa block wall, the geogrid sheets, and the compacted fill dirt creates a structure which is more than a mere 'retaining wall.'" Because, according to this characterization, the "platform structure" occupied over 50% of the rear yard, as well as part of its northern side yard, it violated the Zoning Regulations. The BZA characterized this platform as not having been built to "'resist lateral pressure,'" and characterized the wall as not having been "built in order to resist such pressure and prevent an earth slide." Rather, according to the BZA, "the wall was built and such lateral pressure was supplied afterward by voluntarily compacting a voluminous amount of fill dirt against it," in the process extending the rear yard on a level surface. Thus,

the BZA issued an order ruling in favor of Carome. The Economides' motion for reconsideration was denied in an order issued on October 27, 2006. At no point in either order was the nature of relief discussed. Thereafter, the Economides filed a petition for review by this court.

## II. Standard of Review

■ In reviewing a BZA decision, we must determine "(1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings." *Mendelson v. District of Columbia Bd. of Zoning Adjustment,* 645 A.2d 1090, 1094 (D.C.1994) (quoting *Glenbrook Road Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 31 (D.C.1992)). We will not reverse unless its findings and conclusions are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" in excess of its jurisdiction or authority; or "[u]nsupported by substantial evidence in the record of the proceedings before the Court." D.C.Code § 2–510(a)(3) (2001).

■ An agency's interpretation of the regulations that govern it "must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations." *Glenbrook Road Ass'n, supra,* 605 A.2d at 30 (citing *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 748 (D.C.1990)). At the same time, "where the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference." *Saah v. District of Columbia Bd. of Zoning Adjustment,* 433 A.2d 1114, 1116 (D.C.1981).

## III. Standing

■ Before reaching the question of whether Carome's appeal was time-barred, we must determine whether he had standing before the BZA in the first place. Carome argues that he has standing as an "aggrieved person," a contention with which the BZA agreed. *See* 11 DCMR § 3112.2 (2008) ("Any person aggrieved by any order, requirement, decision, determination, or refusal made by an administrative officer or body, including the Mayor of the District of Columbia, in the administration or enforcement of the Zoning Regulations may file a timely appeal with the Board ...."); *accord,* D.C.Code § 6–641.07(f) (2001) ("Appeals to the Board of Adjustment may be taken by any person aggrieved ... by any ... administrative decision based in whole or in part upon any zoning regulation...."). In *Goto v. District of Columbia Bd. of Zoning Adjustment,* 423 A.2d 917 (D.C.1980), we ruled that the owner of property adjacent to the rear yard of the subject property, on which the owner of that property had built a kiln, was an aggrieved person within the meaning of the zoning regulation because the neighbor resided "immediately behind the subject site." *Id.* at 921.

Specifically, Carome argues that he is aggrieved because he is "directly—and negatively—affected by the elevated platform structure," the northern wall of which purportedly obstructs the view from the front of his house for several months out of the year, thus diminishing his "use and enjoyment of Wesley Heights Park." The BZA agreed and found that "[t]he elevated platform structure looms over adjacent properties, negatively affecting the air and light available to them." But the Economides question whether anyone can be aggrieved under the statute if his or her injury is seasonal. They also assert that Carome's cited use of the Park is inconsistent with his claim—offered in support of his argument that his appeal was timely—that he has not visited the Park since 2002.

Even without invoking the more relaxed standard of standing enjoyed by those who appeal administrative decisions rather than those of the courts, *see Goto, supra,* 423 A.2d at 921 n. 8 ("Administrative appeals do not necessarily depend on the elements of standing that judicial review would require."), we are persuaded that Carome has the better of the argument. There has certainly been an appreciable change in the view from the front of his house. And the BZA's finding of a negative effect upon the air and light available to Carome (as well as other area residents) is an additional reason to conclude that he has standing. While his injury may not be continuous, a claim of a sporadic nuisance is no less worthy in the eyes of the law than a claim of a permanent one, *see* 1 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *Harper, James and Gray on Torts* § 1.30 (3d ed. 2006), and Carome's injury is no less cognizable for being more felt more strongly in warmer months. The fact that his injuries consist of a reduction in the amount of light and air available to him at his residence does not deprive him of standing any more than the temporal nature of his injury does. We thus conclude that Carome had standing to appeal the DCRA's decision to issue the permit.

## IV. Timeliness

■ The other potential procedural barrier to Carome's BZA appeal is its timing, because even if he had standing to challenge the DCRA's issuance of the permit, his appeal would be barred, and the BZA would be without jurisdiction, if his appeal was not timely filed. *See e.g., Waste Mgmt. of Md., Inc. v. District of Columbia Bd. of Zoning Adjustment,* 775 A.2d 1117, 1121 (D.C.2001) ("The require-

ment ... that an appeal be timely is jurisdictional; hence we have said that 'if the appeal was not timely filed, the Board was without power to consider it'" (quoting *Goto, supra,* 423 A.2d at 923)). "'We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute.'" *Basken v. D.C. Bd. of Zoning Adjustment,* 946 A.2d 356 (D.C. 2008) (quoting *Kuri Bros. v. D.C. Bd. of Zoning Adjustment,* 891 A.2d 241, 244 (D.C.2006)).

An individual with standing as an aggrieved person who wishes to appeal an administrative decision to the BZA must do so "within sixty (60) days from the date the person appealing the administrative decision had notice or knowledge of the decision complained of, or reasonably should have had notice or knowledge of the decision complained of, whichever is earlier." 11 DCMR § 3112.2(a) (2007). But where the decision challenged "involves the erection, construction, reconstruction, conversion, or alteration of a structure or part thereof," then the appeal must be filed no "later than ten (10) days after the date on which the structure or part thereof in question is under roof." *Id.* § 3112.2(b)(1). A structure is "under roof" if "the main roof of the structure or part thereof, and the roofs of any structures on the main roof or part thereof, are in place." *Id.* This provision for structures "under roof" does not "relieve an appellant of the jurisdictional requirement in paragraph (a) of this subsection of filing a timely appeal." *Id.* § 3112.2(b)(2). Notwithstanding any other provision of the regulation, a party appealing to the BZA has "a minimum of sixty (60) days from the date of the administrative decision complained of in which to file an appeal." *Id.* § 3112.2(c). The BZA has the power to extend that sixty-day period only if the appellant demonstrates (1) the existence of

"exceptional circumstances that are outside of the appellant's control [that] could not have been reasonably anticipated [and] that substantially impaired the appellant's ability to file an appeal," and (2) that extending the filing period "will not prejudice the parties to the appeal." *Id.* § 3112.2(d)(1)-(2).

In adopting these time limits, the Zoning Commission elaborated upon their intended construction:

> The amendment to 11 DCMR § 3112.2 codifies the principles established in *Waste Management* and prior Court decisions by requiring that all appeals to the Board pursuant to the Zoning Act be filed within sixty (60) days of the date the appellant had actual or constructive knowledge of the administrative decision complained of. Because an appellant may not have notice or knowledge of a decision until construction is underway, the amendment provides that no appeal may be filed later than ten (10) days after the construction is "under roof."

50 D.C.Reg. 1202 (2003).

We have had only one occasion to apply these provisions since the codification of the rule embodied in *Waste Management,* see *Basken, supra,* 946 A.2d 356, but it is clear that the Commission intended the new time limits to be consistent with our prior decisions on what constitutes a reasonable amount of time after a decision, as well as the possibility of exceptions to that rule where there was no actual notice, or the ability to file an appeal within sixty days of the decision was otherwise impaired through no fault of the appellant. Thus, we proceed bearing in mind our previous rulings on reasonableness. *See, e.g., Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment,* 816 A.2d 41, 50 (D.C.2003) (holding seven-month delay between the issuance of

the permits in question and appeal was unreasonable given that there was "substantial evidence from which the BZA could find that the [petitioner] was 'chargeable with notice'" as early as the month of issuance); *Waste Mgmt. of Md.*, *supra*, 775 A.2d at 1122 (observing that "prior decisions of this court have held delays of one or two months in filing appeals to the BZA to be reasonable," but that "a delay of a year was not reasonable," and in all likelihood "a delay of four months would not be reasonable either").

██ Here, although the better part of a year after issuance of the permit passed before Carome filed his appeal, the BZA determined that his appeal was not time barred. In denying the Economides' motion for re-consideration of that decision, the BZA made clear that it "did not extend the time for filing an appeal pursuant to the authority stated in § 3112.2(d) [providing for extensions in certain "exceptional circumstances"]. Instead, it found that the appeal was timely because it was filed within 60 days of when Carome had notice or knowledge of the issuance of the permit." Thus, the question before us is whether the BZA's conclusion on timeliness—that Carome had constructive knowledge of the DCRA's decision sixty or fewer days before the filing of his December 13, 2004 appeal—is a conclusion that "rationally flow[s] from findings of fact supported by substantial evidence in the record as a whole." *Draude v. District of Columbia Bd. of Zoning Adjustment,* 582 A.2d 949, 953 (D.C.1990).[7]

In support of their argument that the BZA erred and departed from its approach in other cases, the Economides point to the permit having been posted since at least June 2004, Carome's purported knowledge of the ongoing construction at the site, and Mrs. Carome's awareness of the negative impact of the so-called structure in the summer of 2004, as well as prior BZA decisions inferring constructive notice where the appellant maintained a watchful eye over challenged construction. They also argue that the appeal was untimely pursuant to the "under roof" rule of the Zoning Regulations,[8] that the BZA was wrong to conclude that this provision was inapplicable to the case at bar, and that in any event the BZA made inadequate factual findings before rendering a decision on the timeliness issue. The findings the Economides assert the BZA failed to make

---

7. Carome contends that "[t]he Economides waived any argument regarding the sufficiency of evidence of timeliness by failing to include proposed findings of fact addressing timeliness." We disagree. A party is not required to submit proposed findings of fact in advance of a BZA ruling. *See* 11 DCMR § 3121.2 (2007) ("The parties are *encouraged* to submit to the Office of Zoning proposed findings of fact and conclusions of law within such time as the presiding officer may direct, which in any event shall not be less than seven (7) days after the transcript of the hearing is delivered to the Office of Zoning" (emphasis added)). The decision not to submit proposed findings of fact does not preclude the Economides from challenging on appeal the validity of legal conclusions the BZA drew on the basis of the facts it did find, as well as those it did not.

8. The "under roof" rule is an explicit exception to the sixty-day rule, evidently designed to give would-be appellants with no actual notice of permit issuance some time to appeal:

> No appeal shall be filed later than ten (10) days after the date on which the structure or part thereof in question is under roof. For purposes of this subparagraph, the phrase "under roof" means the stage of completion of a structure or part thereof when the main roof of the structure or part thereof, and the roofs of any structures on the main roof or part thereof, are in place....

11 DCMR § 3112.2(b)(1).

would have addressed whether the view of the subject property was obscured, and if so, when the wall became visible; the date of the falling of the leaves from the trees around the wall; and whether Carome could hear the construction or was otherwise aware of it.

The BZA, in accordance with its original order granting the appeal, argues that the findings set forth in its order were sufficient to support its conclusion that the appeal was timely. Beyond discounting the importance of the facts argued by the Economides, the BZA contends that it made a finding that Carome's view was obscured by foliage until the middle of October or later, and that the wall was only visible thereafter. Because no contradictory evidence was presented as to when the leaves fell, the BZA views the question as an uncontested one that therefore requires no specific factual finding. Finally, it defends the absence of any findings as to whether Carome could hear the construction noise because although Carome conceded that he heard noise from the Economides' property, he would not have been put on notice of the wall's construction merely by hearing the noise. Rather, he could have reasonably assumed that the noise originated from the construction of the house and not of the wall.

The BZA also found that the surrounding community's alleged general awareness of the construction taking place on the subject property beginning in 2002 was not a sufficient basis upon which to impute knowledge of the wall's construction to Carome. It found, moreover, that because there was no information about the construction of the wall in the public domain, the argument that the community's awareness of the wall's construction was a sufficient basis for the imputation of such knowledge was unpersuasive. Thus, the poor visibility of the area in which the wall

was constructed precluded the inference that existence of construction of and around the house, and Carome's awareness of it, made him aware of the wall.

We cannot say on the record before us that the BZA's conclusion did not have a "rational basis" in the facts it found, particularly given that its legal conclusion here was based on its interpretation of BZA's own governing regulations. *See Watergate W., Inc. v. Districe of Columbia Bd. of Zoning Adjustment,* 815 A.2d 762, 765 (D.C.2003). From the facts in the record respecting Carome's knowledge, the BZA could have concluded that he had constructive knowledge of the decision to issue the permit sixty days or fewer before he appealed it. We would be remiss not to consider the points raised by the Economides, however.

First, with respect to the posting of the permit, Hugo Ardon, the stone mason responsible for supervising construction of the wall, averred in his affidavit that when he began working on the project in June 2004, he saw the permit for construction of a retaining wall posted on the front window of the Economides' residence. The permit alerted viewers only to the fact that a "new retaining wall around rear yard as per plans" could be constructed. While the Economides suggest that this put Carome on notice that the mesa block wall would be built, the geogrid sheets laid, and the compacted dirt filled in between, this suggestion begs the question because it is whether those elements, taken together, can legitimately be called a "retaining wall" that Carome disputes. If he reasonably could have believed that a permit to construct a retaining wall would not permit a project of this magnitude, he cannot be held to have had notice simply because of the posting of the permit.

Second, as to his actual awareness of the construction, Carome's testimony before

the BZA was quite consistent with his legal argument, as well as his statement in an affidavit: "Other than having a vague sense that construction was still happening off and on a lot across the heavily wooded Wesley Heights Park ... I was not monitoring whatever construction activity may have been going on at 4825 Dexter Terrace, N.W. during summer and early fall of 2004." When testifying before the BZA, Carome explained that his "wife, Elsie Carome, went down to the permit office on October 13th, 2004," and when asked why she did so he replied:

> I think that she may have possibly had concerns about what was going on up there. I frankly was working very hard and did not see this. She was concerned about noise coming from the site and she went down. I didn't learn that she went down there until some period of time after that.
>
> . . . .
>
> She has told me that there was loud noise during the day from bulldozers going on at the site.

In fact, Mrs. Carome corresponded with the DCRA in November 2004, and she expressed knowledge of the felling of trees in June 2002, as well as "illegal filling and grading of [the Economides] property ... in the summer of 2004." Her statements in this correspondence with the DCRA and her DCRA complaint readily support an inference that Mrs. Carome was well aware of the construction of the wall more than sixty days before the filing of the appeal, but do not provide a clear answer to the question of whether she was aware of the Zoning Administrator's decision to grant the permit before October 23, 2004. When she knew, however, is irrelevant, because the BZA was free to credit Carome's testimony that he only found out about the specific problems related to the property and the construction thereon sometime (at least a few days, for statutory purposes) after October 13, 2004.[9]

▇▇▇ We are in no position to second-guess the BZA's credibility determinations, which are made "by the finder of fact, who is not confined to a cold paper record but has the opportunity to observe the demeanor of the witnesses." *Rafferty v. D.C. Zoning Comm'n,* 583 A.2d 169, 177 (D.C.1990). Even that credibility determination is of little import, however, because it goes to when Carome *actually knew.* What matters is that it was at about that time, the BZA concluded, that he reasonably *should have known* about the permit and construction. His testimony confirms he did not actually know any earlier than he reasonably should have known. Thus, whatever his wife may have known, Carome was not reasonably expected to know of the issuance of the permit for construction of the retaining wall until fewer than sixty days before he filed his appeal.[10]

---

9. We do note, however, that there are contexts in which, under certain circumstances, knowledge of the actions of one spouse is imputed to the other. *See, e.g., Martinez v. Rodriquez,* 410 F.2d 729, 730 (5th Cir.1969) (contributory negligence of one parent in supervising a child could be imputed to the other parent in suit brought to recover damages for injuries to child); *In re Capasso,* 225 B.R. 573, 577–78 (Bkrtcy.S.D.N.Y.1998) (wife knew or should have known husband understated income tax liability in joint income tax return); *see also Manderfeld v. Krovitz,* 539 N.W.2d 802, 807 (Minn.App.1995). That the BZA did not impute such knowledge here is a determination of fact, not of law, and we defer to its determination.

10. Our deference to the BZA's determination on this question reflects our view that the facts are disputed here, and therefore when Carome should have known is a question for the trier of fact to resolve, not one for us to review de novo. *See, e.g., Sutton v. Banner Life Ins. Co.,* 686 A.2d 1045, 1051–52 (D.C. 1996) (holding there was "a question of fact

Third, we are unpersuaded by the Economides' charge of inconsistent application of the notice rules by the BZA. We have carefully reviewed all of the BZA decisions brought to our attention and have little trouble distinguishing them.[11] *Appeal No. 17468 of Advisory Neighborhood Commission 6A*, 54 D.C.Reg. 2077 (2007), offers the Economides the most support. In that case, three weeks after obtaining a permit, the owner posted the permit and began construction. The BZA found that "[s]igns of ongoing construction" beginning that day "were visible to the neighbors [and] included the presence of a large dumpster, replacement of the roof, and the gutting of the interior." *Id.* at 2078. At some point neighbors nearby "noticed from their windows construction, plumbing and appliances that indicated an expansion of the existing building." *Id.* They alerted their local ANC some eight months after the permit was issued, and two months later the ANC filed an appeal. The BZA determined that "there were a series of activities that should have put the ANC and its constituents on notice of the decision complained of dating back to [the time] when

the owner posted the building permit on the property and when construction began." *Id.* at 2080.

The BZA explained that although "the permit and the construction may not have put the ANC and its constituents on notice of the exact nature of the construction, the regulations contemplate an obligation within a reasonable period of time to undertake due diligence to determine such nature." *Id.* This language conceivably supports the proposition that general construction activity, even if unclear to area residents, imposes upon them a duty to investigate. Significantly, however, the BZA next found that "[t]he nature of the work was evident in the Application for the Building Permit, filed at DCRA and available for public viewing. That application clearly states on its face that the nature of the work was to reconfigure the apartment house . . . ." *Id.* Here, in contrast, the construction was far more obscured, and the permit showed only the intent to build a "retaining wall." Carome does not dispute the issuance of a permit for a retaining wall per se. What

whether there were circumstances known to both parties from which the trier of fact could conclude that [insurer] either knew or should have known that the [insured] had not and would not have agreed to" new contract term that would have modified rights under insurance policy); *Burns v. Bell*, 409 A.2d 614, 617 (D.C.1979) (applying discovery rule to question of when victim should have known of doctor's negligent act, and concluding that "the determination of when appellant should have reasonably discovered her injury under the instant circumstances is, in our view, a question of fact and should have been submitted to the trier of fact"); *Witherell v. Weimer*, 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869, 874 (1981) ("In many, if not most, cases the time at which an injured party knows or reasonably should have known both of his injury and that it was wrongfully caused will be a disputed question to be resolved by the finder of fact. Where it is apparent from the undisputed facts, however, that only one con-

clusion can be drawn, the question becomes one for the court." (citations omitted)); *cf. Basken, supra*, 946 A.2d at 366 n. 23 (holding that where material facts relied upon in determining question of timeliness were undisputed, "whether, upon these facts, petitioners knew or reasonably should have known of the DCRA zoning decision is a question of law that we review de novo").

11. For example, the scrutiny of construction was far greater in *Appeal No. 17127 of Nebraska Avenue Neighborhood Ass'n*, 52 D.C.Reg. 5854 (2005), and the construction was far less obscured in *Appeal No. 15129 of Richard B. Nettler* and *Appeal No. 15136 of Phil Mendelson*, disposed of jointly; *see Board of Zoning Adjustment Appeal Nos. 15129, 15136* (Apr. 24, 1992), *available at* http://dcoz.dc.gov/orders/15129—2140-37-38.pdf, *rev'd, Mendelson v. District of Columbia Bd. of Zoning Adjustment*, 645 A.2d 1090 (D.C.1994).

he disputes is whether it was right for the DCRA to issue a permit for a "retaining wall," a designation that obscured the magnitude of the project, with its geogrids and fill dirt, and could not be divined from the permit, however conspicuously posted. *See also Basken, supra,* 946 A.2d at 365 (holding that a building permit as posted "was ambiguous" as to what it approved and therefore "failed to afford notice of the zoning decision").

■ As for the Economides' contention that the "under roof" rule should have been applied, the BZA concluded the section was inapplicable because the wall has no roof. We agree. A structure is defined as "anything constructed, including a building, the use of which requires permanent location on the ground, or anything attached to something having a permanent location on the ground and including ... platforms ... and retaining walls." 11 DCMR § 199.1 (2007). A retaining wall, as is evident elsewhere in the Zoning Regulations as well, is a structure. So is a building, which is defined as "a structure having a roof supported by columns or walls for the shelter, support, or enclosure of persons, animals, or chattel." *Id.* Once a structure is "under roof," an aggrieved party has ten days to appeal. 11 DCMR § 3112.2(b)(1) (2007). The stated purpose of that regulation is to allow an appellant more time than he or she would otherwise be allotted under the sixty-day rule where "an appellant may not have notice or knowledge of a decision until construction is underway." 50 D.C.Reg. 1201. Things (for lack of a better word) with roofs (or at least, presumably, most of them) are struc-

tures, buildings are structures, and retaining walls are structures. Any building is necessarily a structure that also has a roof. There is no similar requirement that a retaining wall have a roof in order for it to qualify as a structure, however. Thus, the BZA did not err in deciding that although this particular retaining wall has no roof, it nonetheless qualifies as a structure.

## V. Statutory Interpretation

■ The Zoning Regulations of the District of Columbia mandate that "[w]ords not defined in [the Regulations themselves] shall have the meanings given in Webster's Unabridged Dictionary." 11 DCMR 199.2(g) (2007). According to the most recent edition of that dictionary, a retaining wall is "a wall built to resist lateral pressure other than wind pressure; esp.: one to prevent an earth slide." *Webster's Third New International Dictionary of the English Language (Unabridged)* 1938 (2002). The question here is whether what the Economides built was a retaining wall, thereby shielding it from the land-use restrictions it might otherwise violate. Although the answer to this question turns more on a technical than a legal discussion, our review ultimately asks whether the BZA's conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," D.C.Code § 2–510(a)(3), and whether they were supported by substantial evidence in the record. *Id.*

The notion of reinforced earth, and its ability to remedy the instability that results from building retaining walls too high, is not a novel one.[12] The question

---

12. *See* F.D.C. Henry, *The Design and Construction of Engineering Foundations* 557 (1986); T. Yamanouchi & N. Fukuda, The State of the Art of Geosynthetic Reinforced Soil Structures, *Geotechnical Engineering: Emerging Trends in Design and Practice* 305,

305, 311 (K.R. Saxena, ed. 1994) ("Since ancient times natural geotextiles such as timber, bamboo, twigs, reeds, jute, hemp, and palm fibre have been used for the reinforcement of the earth together with the enrichment of it with additional bending and tensile strength

here is whether the addition of reinforced earth and geogrids, layered adjacent to a wall in a way that creates a certain interdependency—the wall relying on the geogrids and fill dirt for stability, the geogrids and fill dirt relying on the wall to keep compacted soil from falling out—transforms this into a structure that is not a retaining wall and must consequently meet several Zoning Regulations, specifically:

- that no structure occupy more than 50% of a yard, 11 DCMR § 199.1;

- that no structure over four feet above grade be erected in a yard, other than a retaining wall, *id.* §§ 2503.2–2503.3;

- that no structure occupy more than 30% of the area of a lot within the WHOD, *id.* § 1543.2; and

- that activities within the WHOD maintain its character in certain respects, *id.* § 1541.3.[13]

If the mesa block wall is a retaining wall, to be considered separately from the surface area occupied by the platform created by the stacked geogrids and fill dirt, the Economides prevail. If the mesa block wall is considered to be a structure, part of which is that platform, they do not.[14] Although the record, to which we now turn, contains support for the Economides' position, it is insufficient to carry the day before this court.

The BZA heard extensive testimony from Robert Pinciotti, a professional geotechnical engineer who testified as an expert before the BZA on behalf of the Park Service. Pinciotti is also a civil engineer with substantial experience overseeing geotechnical construction issues, including the building of retaining walls. He testified that he had previously compiled design packages similar to the one prepared for the Economides property. Pinciotti's testimony was that the structure built in the Economides' rear yard "is more accurately referred to as a Mechanically Stablized Earth (MSE) retaining structure or system . . . because it is made of several different component parts that are interdependent." These components are the compacted soil, the geogrids, and the veneer composed of the mesa blocks, which are stacked in courses, that is, continuous layers. Important to the MSE-retaining wall distinction, according to Pinciotti, is that

> [w]hile the MESA blocks give the appearance of a wall, they could only be used without the geogrid for very limited heights, say less than four courses. Above approximately four courses, the blocks would, overtime [*sic*], be pushed over by the lateral earth pressure of the retained soil.

Pinciotti also explained that compacted soil, with steeper slopes, is unstable without reinforcement from the geogrids. And the stability of the geogrids in turn de-

---

in the construction of embankments, stabilization of weak foundations, and flood control.").

13. "The purposes of the WH Overlay District" are threefold: to (1) "[p]reserve in general the current density of neighborhood;" (2) "[a]llow reasonable opportunities for owners to expand their dwellings; and" (3) "[p]reserve existing trees, access to air and light, and the harmonious design and attractive appearance of the neighborhood." 11 DCMR § 1541.3 (2007).

14. The legal conclusion may not be as clear as a matter of law with respect to the more aesthetic, abstract rules governing the WHOD, *see* 11 DCMR § 1541.3, but the parties appear to agree that the question is of the all-or-nothing variety. We express no opinion on the merits of the various other statutory provisions allegedly breached by the construction project at issue. *See infra* note 5.

pends on friction possible only with the proper level of soil compaction. Pinciotti compared the structure at issue to the MSE owned by the city of Gaithersburg, Maryland, where stepped geogrids and other geosynthetic materials were used to minimize encroachment of the dam of one lake upon an adjacent lake, to demonstrate that "an MSE structure, like the Economides' structure, need not incorporate a walled veneer in order for it to be a functional retaining structure." This does not mean, however, that no retaining structure is required. But in Pinciotti's opinion, the geostructure could stand almost entirely intact without the mesa block veneer, yet the veneer itself could not stand nearly as tall without the rest of the geostructure.

The proposition offered by Pinciotti that the wall, geogrids, and fill dirt are in a sense interdependent components of a geostructure is integral to the position adopted by the BZA, and was never challenged by any of the testimony offered in support of the Economides' position. For example, Abdullah Barrow, a structural engineer employed by the DCRA, who submitted an affidavit, concluded that "the wall at issue here is a retaining wall that can be classified as an [sic] mechanically stabilized earth structure" and that it "does not lose its character to retain the earth if it is included in a geogrid system of the MESA wall." In his affidavit, he explained that in his experience "a wall that is erected to retain soil, such as this one, does not change its function if the soil used to backfill the project is added to the site." He added that "[t]here is nothing in the D.C. Building Code which prohibits a property owner from backfilling a site," and further, that "since a retaining wall is erected to retain earth, the D.C. Building Code does not limit its height." Both Barrow's qualifications and his conclusions

were challenged by Pinciotti in an subsequent affidavit filed with the BZA. More important is the fact that Barrow's affidavit evinces a belief that a retaining wall, when part of an MSE structure, is *not less* than a retaining wall, but never contradicts Pinciotti's position that this was *more* than a retaining wall.

The DCRA's view of the issue was similarly evident in the testimony of the District's Zoning Administrator, Toye Bellow, who maintained that it was unnecessary to "reach a specific definition to be able to arrive at some reasonable understanding of what the function of this wall is, that is[,] it is designed to retain." And while he viewed the geostructure as a retaining wall, he had to concede that the permit application approved did not disclose that geogrids would be part of the wall, nor that it would have layers of compacted soil. Thus, what Bellow's office thought it was approving was "the erection of a retaining wall," and thereafter, according to Bellow, "clearly the zoning review would have been limited to whether it could occupy the yard that it was to be located in." Everything but the wall was "irrelevant to the Zoning Regulations."

This vacuum in which Bellow indicated proposed construction could be evaluated is troubling because it betrays an overly technical approach to permit issuing, one that may miss the point of the Zoning Regulations. Thus it is not at all surprising that the BZA's chairperson, Geoffrey Griffis, expressed concern over whether it was accurate to suggest, as Bellow did in his testimony, that if the Economides had simply piled up the fill dirt, with no wall, they would not have needed a permit. Bellow's testimony could only have been further undermined by Pinciotti's challenge of Bellow's proposed definition of a

retaining wall.[15]

Along the same lines, other affidavits submitted by two persons who worked on the project for the Economides (and who could reasonably have been viewed as partisan) suggested that although this particular structure was a retaining wall, whatever else was made a part of it was irrelevant to whether what the Economides built satisfied the definition. William Ryan, the principal of the engineering firm that performed the work for the Economides, maintained in an affidavit that "[t]he retaining wall is indeed a true retaining wall, contrary to the allegations by Patrick Carome." In support of that conclusion, he averred that "[a]ll Mesa block retaining walls rely on a geogrid system (grids, properly compacted soil and gravel) for support," and "[a]ll properly constructed retaining walls whether or not Mesa blocks, rely on some in[-]ground reinforcing system for support, such as [a] geosynthetic grid, steel traps, steel reinforced concrete or wood 'deadmen.'" While Ryan's position that all mesa block retaining walls require a geogrid system, that does not mean all—or any—mesa block retaining wall structures are merely "retaining walls" within the meaning of the Zoning Regulations. To acknowledge, moreover, that any retaining wall needs in-ground reinforcement does not require granting carte blanche to the would-be builder to include in the structure any reinforcement mechanism of his or her choice. The affidavit of Hugo Ardon, the stone mason who built the wall for the Economides, by conceding that the geogrids are "part of the structure" but contending that they are nevertheless part of the retaining wall, similarly suggests no limit to what could legitimately be part of a "geogrid retaining wall."

■ The various expert opinions may not offer a clear answer to the question of whether or not MSE retaining walls such as the one at issue are retaining walls or other structures under the Zoning Regulations, but the BZA's position is well supported by the evidence presented. The BZA did not explicitly refer to the Economides' wall as an MSE structure, and instead appeared to conclude that it is a "platform" structure—which, like other yard structures, does not enjoy the same exemptions as a retaining wall, see 11 DCMR § 199.1. Thus, the BZA concluded that whatever sort of structure this was, it was not, statutorily speaking, a retaining wall. And although the most erudite testimony came from Pinciotti, the BZA could have relied on any number of expert submissions that supported its decision.[16] We cannot deem its categorization of this structure to have been without substantial support in the record, and the decision is far from arbitrary. Indeed, it strikes us

15. We consider irrelevant the disputes below over which Building Code provision to apply: neither the Zoning Administrator nor Pinciotti discussed what the current Building Code, also applicable at the time the permit was issued, has to say about retaining walls or what substances can be used to create them. The District's current Code does not address this. See 12A DCMR § 101.2 (2007).

16. This sort of structure has many conceivable definitions, it seems. In a report that Carome asked him to provide, Peter Neubauer, a registered professional engineer of the District of Columbia, described what he phrased as a "retaining structure" to be "comprised of a concrete masonry wall that is attached at intervals along its height to synthetic fabric mats (also called geogrids) that lay horizontally behind the wall." Allyn Kilsheimer, another registered professional engineer and president of a structural engineering firm, referred in his report to the "structure" as "a large geostructure type wall relying on earth characteristics and gravity for support in an acceptable bootstraps approach."

as a perfectly reasonable interpretation of the Zoning Regulations, the construction of which will, as we have said, enjoy a fair amount of deference from this court. *See also Kalorama Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 934 A.2d 393, 400–01 (D.C.2007). But before we can finally resolve this appeal, we must address the Economides' argument of equitable estoppel.

## VI. Estoppel

■■■■ The Economides now argue that the doctrine of equitable estoppel now bars the DCRA from enforcing the Zoning Regulations against them at this point by in effect revoking the permit it originally granted. To invoke the doctrine of equitable estoppel successfully, the petitioners must show that they implemented: "(1) expensive and permanent improvements, (2) made in good faith, (3) in justifiable and reasonable reliance upon, (4) affirmative acts of the District government, (5) without notice that the improvements might violate the zoning regulations; and (6) [that the] equities [ ] strongly favor the petitioners." *Interdonato v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1000, 1003 (D.C.1981). As an initial matter, we note that "the defense[ ] of estoppel ... [is] judicially disfavored in the zoning context because of the public interest in enforcement of the zoning laws." *Beins v. District of Columbia Bd. of Zoning Adjustment,* 572 A.2d 122, 126 (D.C.1990); *Interdonato, supra,* 429 A.2d at 1003. Nonetheless, "it is accepted that in certain circumstances an estoppel may be raised to prevent enforcement of municipal zoning ordinances." *Saah, supra,* 433 A.2d 1114, 1116 (D.C.1981).

■■■■ The estoppel argument, however, was not raised before the BZA, and as a general rule, equitable estoppel cannot be raised for the first time on review by this court. *See Duke v. Am. Univ.,* 675 A.2d 26, 28 (D.C.1996). The Economides argue, however, that we "appear to recognize that the estoppel defense may be asserted on appeal after the Board issues a ruling." In support of this interpretation they cite *Goto, supra,* 423 A.2d 917. *Goto,* however, is distinguishable.

The petitioner in *Goto* had initially benefited from a favorable determination by the Zoning Administrator that she did not need a permit to build a kiln to be attached to her pottery shop. *Id.* at 918. A local citizens' association appealed, the BZA reversed, and Goto appealed the decision to this court. She claimed, *inter alia,* that the BZA was "estopped from enforcing the Zoning Regulations against her because she relied to her detriment on the assurances of District officials that the kiln could be constructed without a permit," and in the alternative offered a laches argument, claiming the association was barred because it "waited to appeal until after she had undertaken significant work on the kiln." *Id.* at 925. Because we concluded that the association's appeal to the BZA was barred by laches, we had no need to reach the estoppel question. We noted, however, that "[t]he same elements of prejudice cited by Goto to support her laches defense give weight to her argument that the District is estopped from reversing its agents' earlier decision that a permit is not required." *Id.* n. 15. While all six of the estoppel factors were "arguably" met, we opined, "[i]t is not clear that estoppel will bar a case brought by a neighboring landowner; arguably, that defense may be asserted only against the municipality which rendered the decision on which a party relied." *Id.* n. 15.

In *Goto,* the DCRA did not become involved in enforcement until after the BZA proceedings had concluded, "*i.e.,* until the BZA rendered a decision adverse to Goto

which became the official position of the District." *Id.* n. 15. Estoppel as a defense, the court suggested, "thus may not have been available to Goto until the proceedings in this court, in which she could argue that the BZA could not compel her to observe zoning requirements that other agents of the District were estopped to enforce." *Id.* n. 15.

That the defense was not available until the BZA had granted the appeal, however, did not mean that the argument did not need to be raised below to be preserved. And indeed, a review of the record in *Goto* reveals that both the estoppel and laches issues were raised below, although that fact was not included in the opinion. While we need not decide the precedential value of the language in *Goto,* nor under what conditions the BZA reversal of the Zoning Administrator's issuance of a permit can furnish an estoppel claim, we can at the very least say that the estoppel issue likely would never even have been discussed hypothetically in *Goto* had it not been raised before the BZA as a defense.

Here the construction of the structure at issue was completed well before the petition for review was filed, and considering the expense at which the structure was installed, the merits quite possibly could have favored the Economides, certainly enough for it to have been worthwhile including, as the petitioner in *Goto* did, the argument that the BZA should find in their favor on the ground of equitable estoppel. Even were we to rule that the defense did not become available until after the BZA granted Carome's appeal, at a bare minimum the Economides should have then recognized that the BZA had adopted a position adverse to them, and accordingly should have raised the estoppel argument in their motion for reconsideration. They did not do so at their peril.

## VII. Relief

 The relief originally requested, as discussed above, *supra* Part I.D, was never discussed in the BZA's order granting the appeal. As a general matter, "[t]his court has jurisdiction to review all 'final orders and judgments' of the Superior Court." *Heard v. Johnson,* 810 A.2d 871, 876 (D.C.2002) (quoting D.C.Code § 11–721(a)(1) (2002)). Although the parties have not contested our jurisdiction to hear this petition, we note that the BZA's order is, for present purposes, sufficiently "final" for us to review it, despite the fact that it mandates no specific relief. The District's Administrative Procedure Act vests this court with jurisdiction to review specifically any "order or decisions of the Mayor or an agency in a contested case" where a person has suffered "a legal wrong, or [has been] adversely affected or aggrieved" by that order or decision. D.C.Code § 2–510(a) (2001). A contested case is "a proceeding before ... any agency in which the legal rights, duties, or privileges of specific parties are required by any law ... to be determined after a hearing before the Commissioner or the Council or before an agency." *W.C. & A.N. Miller Dev. Co. v. D.C. Zoning Comm'n,* 340 A.2d 420, 422 (D.C.1975) (quoting statutory text). Thus, preliminary approval of a planned unit development was deemed a contested case for purposes of appellate review, *Dupont Circle Citizens Ass'n v. D.C. Zoning Comm'n,* 426 A.2d 327, 331 (D.C.1981), as was an order approving a university's plan for campus development during a 15–year period. *Levy v. D.C. Bd. of Zoning Adjustment,* 570 A.2d 739, 749 n. 14 (D.C.1990) (noting that "an order in a contested case must 'impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process' ").

There was no more "specific relief" ordered by the BZA in either of those cases than in ours, but as in our case, the legal rights of the parties were clearly affected by the BZA decision, and this court was therefore vested with jurisdiction to review. Mr. and Mrs. Economides were, by the BZA's order, severely restricted in the use of their land, and were evidently aggrieved by the decision. Further action is required following this opinion, to be sure: Because we agree that the DCRA erred in issuing the permit, the Economides' structure currently violates the Zoning Regulations, and correction should occur in the manner prescribed by the District's Building Code. *See* 12A DCMR § 113A (2007). The DCRA must inform the Economides of the fact that their property is no longer in line with the law, and they must cure the violation or face legal action from the Office of the Attorney General. *See* D.C.Code §§ 6–1405.01, –1407 (Supp.2008). But it was not the BZA's charge to order the relief, and the Economides' rights have already been affected following the BZA's decision that the permit is effectively invalid because it was wrongly issued. We agree with the BZA, and its decision is

*Affirmed.*